969 F.2d 692
 36 Fed. R. Evid. Serv. 36
 UNITED STATES of America, Appellee,
v.
Mary Louise GAINES, Appellant.
UNITED STATES of America, Appellee,
v.
Victor Okechukwu DILLIBE, Appellant.
UNITED STATES of America, Appellee,
v.
Kenneth Uchechukwu OKENWA, a/k/a Kenneth Octochukwu Okenwa, Appellant.
 Nos. 91-2527, 91-2545, 91-2563.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 12, 1992.
Decided July 14, 1992.
Rehearing Denied in Nos. 91-2545
and 91-2563 Sept. 18, 1992.
 
 Paul C. Engh, Minneapolis, Minn., argued for appellant Mary Louise Gaines.
 Douglas H. Olson, Minneapolis, Minn., argued (Jarrett B. Decker, on the brief), for appellant Victor Dillibe.
 Arthur R. Martinez, Minneapolis, Minn., argued, for appellant Kenneth Okenwa.
 Frank J. Magill, Jr., Asst. U.S. Atty., Minneapolis, Minn., argued, for appellee.
 Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and LOKEN, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Victor Dillibe, Kenneth Okenwa, and Mary Gaines appeal from their convictions for aiding and abetting the distribution of heroin, distribution of heroin, attempt to possess heroin with intent to distribute, and conspiracy.[1] The transactions involved the sale of heroin imported from Nigeria. All three argue that there is insufficient evidence of conspiracy. Gaines and Dillibe argue that the court improperly instructed the jury on constructive possession. Gaines argues that the district court[2] abused its discretion by refusing to permit the testimony of an investigator, which would have corroborated her entrapment defense. Dillibe argues the evidence is insufficient to sustain two counts of attempted possession of heroin. We affirm the convictions.
 
 
 2
 Paula Berg, a court reporter in the Minnesota state courts, was arrested during a heroin sale to an undercover officer. She then agreed to cooperate with law enforcement officers, and named her heroin sources as Gaines, Dillibe, Okenwa and Briggs[3]. Berg agreed to introduce Officer Susan Ek to her sources. Berg first introduced Ek to Gaines. On September 6, the three met and Gaines sold Ek 5 grams of heroin for $1,500.00. During the meeting, Gaines identified her source as her boyfriend, "Kenny." On September 17, Gaines told Ek in a telephone conversation that "her boyfriend, Ken, was expecting a large shipment of heroin." Gaines later explained that "Ken wanted to get out of the heroin business," but wanted to do one last "big deal." Ek did not go forward with the transaction.
 
 
 3
 On November 20, Gaines contacted Ek and told her that Dillibe had resumed his trips to Nigeria for heroin, and that she was ready to be her source of supply again. She told Ek that the price had increased to $375 a gram, and Ek ordered two grams. The two met at a restaurant the following day and Ek purchased one gram of heroin. On November 26, 1990, Gaines and Ek spoke by telephone. Gaines told Ek that Dillibe had just dropped off four grams of heroin. Ek ordered two grams, and the two met on the parking lot of an elementary school where Gaines sold Ek approximately 3 grams of heroin for $750.00 (although Gaines thought she was only selling two grams). While Ek weighed the heroin, Gaines said that she did not have a scale and had to rely on "Victor" to break off the weight ordered by her customers. Gaines told Ek that Dillibe would "front" her five to ten grams of heroin and that she could get larger quantities if she gave Dillibe money up front.
 
 
 4
 On November 28, 1990, Berg introduced Ek to Dillibe as one of Berg's ex-customers. Dillibe told Ek that he was Gaines' heroin source and knew that she had been purchasing from Gaines. He suggested that Ek buy directly from him and offered to front her ten grams that day, which Ek declined. On November 30, Ek met with Dillibe, and Dillibe sold Ek 10 grams of heroin for $3,500.00. A similar transaction occurred on December 5.
 
 
 5
 Ek and Dillibe met the next day at a restaurant and Ek made a $1,000 partial payment on a 10 gram purchase of heroin. Over dinner, Dillibe discussed the heroin business. Dillibe told Ek that he had several contacts in Chicago, a major heroin distribution hub. Ek and Dillibe met on December 18, and Ek paid the $2,500 owing from her December 6 purchase. Dillibe told Ek that he was considering an extended trip to Nigeria and offered to provide Ek with the heroin she would need while he was out of the country. He fronted Ek another 10 grams of heroin.
 
 
 6
 Ek remained in contact with Gaines, and on December 18, the two spoke on the telephone. Gaines said that "she was still dealing with Victor," and wanted to sell heroin to Ek. Ek told Gaines that she needed more heroin, and Gaines responded that Victor would give her more if she provided money up front. On January 3, 1991, Gaines told Ek her source was leaving for Nigeria for more heroin, but had some to sell before leaving. Gaines wanted to go into partnership with Ek to raise $12,000 to purchase 40 grams of heroin, and told Ek that Dillibe was "aware of the situation".
 
 
 7
 The next day, Ek and Dillibe met at a restaurant to resume their talks about a possible large heroin transaction. Ek told Dillibe that she had an ex-boyfriend who had previously loaned her $85,000. Phone calls followed on January 6 and 9, 1991, concerning the large transaction, and Ek told Dillibe that she had arranged an $86,000 loan. On January 9, Gaines called Ek, and told her that her source was still in town and she wanted to sell Ek four ounces. Gaines also told Ek that Okenwa wanted $12,000 as a down payment on the four ounces, and that Okenwa had "other customers" but wanted to sell the four ounces to Ek and Gaines "because he felt more comfortable with [them]." During this conversation, Gaines said that Dillibe wouldn't "move" until Okenwa "move[d]" and that their heroin came from the same source.
 
 
 8
 On January 10, Dillibe called Ek and told her he had a problem and wanted to meet her in person. The two met, and Dillibe explained that he received a telephone call from a person in Chicago who said that he had a problem. Before Dillibe could ask what the problem was, the line went dead. He told Ek that he did not have the ten ounces of heroin. He said that the man who held his heroin for him had disappeared, that he had driven past the house where the person was staying, but no one was there. He identified the person holding the heroin as a Nigerian cab driver and said that he was considering "staking out" the house to "find the guy." Ek offered to cancel the deal but Dillibe wanted to continue the transaction.
 
 
 9
 Dillibe and Ek also talked about the four ounce sale Ek had been discussing with Gaines and Okenwa. Dillibe admitted that he had talked with Gaines and Okenwa about the four-ounce transaction, but that he did not know that Ek was the customer. Dillibe suggested that Ek purchase the four ounces from Gaines and Okenwa to see if they had stolen his heroin. Ek paid Dillibe $3,000 for the last ten gram front, and Dillibe agreed to split the interest cost Ek was paying on the $86,000 loan.
 
 
 10
 On January 14, 1991, Ek called Gaines and told her that if she and Okenwa were serious about the four-ounce deal, she would need a ten-gram front to pass out to her customers to check the quality. The next day Gaines, Okenwa, and Ek met at a restaurant. Gaines renewed the offer to sell Ek four ounces, and Ek told them for the first time that she had also been dealing with Dillibe. She told them that she had $86,000 available from a transaction with Dillibe that had broken down, and offered to buy the four ounces outright. Okenwa said that the four ounces would cost $300 a gram, and calculated the price at $33,600. Ek offered to buy the four ounces for $30,000. Gaines and Okenwa conferred, and then agreed to sell the four ounces at Ek's price. Okenwa went out to Gaines's car to get the 10 grams for Ek to test. Okenwa returned, and they decided to pass off the heroin on the lot outside the restaurant. Gaines and Okenwa went to Gaines's car, and Gaines gave Ek 10 grams of heroin. Ek started to drive out of the parking lot and the two started to follow her. Okenwa was driving the car, and started honking at Ek. Ek stopped, and Gaines got out of the car. Gaines told Ek that there had been a misunderstanding and that Okenwa needed partial payment for the ten grams. Ek refused saying that if they couldn't afford to front her ten grams, then she wasn't interested in doing business with them. Gaines retracted her request.
 
 
 11
 On January 17, Ek and Gaines met. Ek told Gaines that her boyfriend would be waiting in a hotel room near the restaurant with the money, and when she checked quality they would go to the hotel room and make the exchange. Gaines and Okenwa drove up, Gaines got out of her car, and told Ek that Dillibe was holding the four ounces, and that he would not release the heroin until Ek paid for the ten gram front, as well as the ten-gram front that they had brought that day. Gaines and Okenwa were then arrested. As Okenwa raised his hands, he was seen dropping an item between the two front seats of the car, which was 10.5 grams of heroin. Dillibe was arrested shortly thereafter.
 
 
 12
 After trial on a thirteen-count indictment, the jury returned convictions on all counts except one.
 
 I.
 
 13
 Gaines, Okenwa, and Dillibe all argue that there was insufficient evidence to sustain the conviction for conspiracy charged in Count III, extending from November 21, 1990, to January 17, 1991.
 
 
 14
 Okenwa specifically argues that there was not a meeting of minds between him and Gaines, and therefore, there can be no conspiracy. He says that the only evidence linking him to the conspiracy was the January 15 meeting between Ek, Gaines, and himself, and that there was no agreement or discussion between him and Gaines on that day. Okenwa contends that the circumstances of this case are similar to those in United States v. Iennaco, 893 F.2d 394 (D.C.Cir.1990). In that case, the D.C. Circuit reversed a conviction for conspiring to distribute narcotics, holding that there was no agreement only "unaccepted offers and much tentative talk." Id. at 398.
 
 
 15
 Along similar lines, Dillibe argues that although Ek testified that Gaines identified Dillibe as her heroin source, there was no evidence that he actually supplied Gaines with heroin, and further, no evidence that he had any role in Gaines's sales to Ek. Dillibe says the evidence shows at best that he was Gaines's source for two small transactions on November 21 and 27. Gaines simply adopts the arguments of Okenwa and Dillibe.
 
 
 16
 Our standard of review on sufficiency of the evidence is whether in the light most favorable to the government, there is substantial evidence to support the jury's verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The government must be given the benefit of all inferences that may reasonably be drawn from the evidence. United States v. Holm, 836 F.2d 1119, 1122 (8th Cir.1988). To establish conspiracy, there must be proof that the defendants entered into an agreement to distribute narcotics, and no overt act is necessary. United States v. Covos, 872 F.2d 805, 809-10 (8th Cir.), cert. denied, 493 U.S. 840, 110 S.Ct. 124, 107 L.Ed.2d 85 (1989).
 
 
 17
 Here, there was evidence that Ek was in direct contact with Gaines, Okenwa, and Dillibe, and that the three worked together. Berg told Ek that her heroin sources were Gaines, Dillibe, and Okenwa, and Gaines told Ek that she got her heroin from Okenwa and that his heroin was "the same" as Dillibe's. Dillibe knew about the four-ounce transaction that Ek was negotiating with Okenwa and Gaines, and Gaines told Ek that Dillibe "was aware" of the transaction. Okenwa and Gaines negotiated the four ounce sale with Ek. When the January 17 deal fell through, Ek blamed Dillibe explaining that he would not release the heroin. Gaines also told Ek that she and Okenwa had a ten-gram front instead of four ounces, and when arrested, officers observed Okenwa dropping approximately ten grams of heroin between seats of the car. From this evidence, a jury could reasonably infer that Gaines, Okenwa, and Dillibe worked together to distribute narcotics, and that a conspiracy between the three existed.
 
 II.
 
 18
 Dillibe and Gaines argue that the district court erred in instructing on constructive possession with respective to Counts X and XII. The court instructed the jury that a person has constructive possession over a thing when the person has both the power and intention at a given time to exercise dominion or control over it, directly or indirectly or through another person or persons.[4]
 
 
 19
 The government requested a constructive possession instruction based on the evidence that Dillibe told Ek that he called a person in Chicago who was holding the heroin and the line went dead, and that he was unsuccessful in locating this person or the heroin. Dillibe and Gaines say that the content of this conversation demonstrates that Dillibe did not exercise dominion or control over the heroin, and thus, there was no factual predicate for the instruction.
 
 
 20
 The district court has wide discretion in formulating instructions. United States v. Figueroa, 900 F.2d 1211, 1216 (8th Cir.), cert. denied, 496 U.S. 942, 110 S.Ct. 3228, 110 L.Ed.2d 675 (1990). Here, there was evidence that Dillibe had a Nigerian cabdriver hold heroin for him, and while not under his actual possession, it could be deemed under his "dominion and control." When Okenwa was arrested, police found ten grams of heroin between the car seats, and while he did not actually possess it when it was found, the issue of constructive possession was inherent. The district court did not err in instructing on constructive possession.
 
 III.
 
 21
 Gaines argues that the district court abused its discretion by refusing to admit a statement of a private investigator.
 
 
 22
 At trial, Gaines called Wayne Overbo as a witness. Overbo is Berg's ex-husband, who also pled guilty to narcotics charges. Overbo refused to testify, claiming his fifth amendment privilege. Gaines then sought to call a private investigator to testify that Overbo told her that he never saw Gaines deal or use heroin. The court refused. Gaines contends that the investigator should have been allowed to testify under the "catch-all" hearsay exception set forth in Fed.R.Evid. 804(b)(5).
 
 
 23
 To be admissible under Rule 804(b)(5), Gaines must establish: (1) the declarant is unavailable; (2) the statement must have circumstantial guarantees of trustworthiness equivalent to the first four exceptions in Rule 804(b); (3) the statement must be offered as evidence of a material fact; (4) the statement must be more probative on the point for which it is offered than any other evidence that the proponent reasonably can procure; (5) the statement must serve the interests of justice and the purposes of the federal rules; (6) the proponent of the evidence to be offered must have given her adversary notice. Fed.R.Evid. 804(b)(5); United States v. Love, 592 F.2d 1022, 1026 (8th Cir.1979). Rule 804(b)(5) is to be used " 'rarely, and only in exceptional circumstances.' " United States v. Woolbright, 831 F.2d 1390, 1396 (8th Cir.1987) (quoting Love, 592 F.2d at 1026).
 
 
 24
 Considering these criteria, we cannot conclude that the district court abused its discretion in refusing to admit the investigator's statement. First, the statement lacks circumstantial guarantees of trustworthiness. Initially, Okenwa and Dillibe strenuously challenged Overbo's competency to testify because of his heroin addiction. In any event, the statement was only marginally relevant. The investigator's statement did not add much to Gaines's own testimony that she never sold heroin before her first transaction with Ek. The district court did not abuse its discretion in refusing to admit the private investigator's statement.
 
 IV.
 
 25
 Dillibe argues that there was insufficient evidence to sustain his convictions for attempted possession of ten ounces of heroin, and aiding and abetting the attempted possession of four ounces of heroin.
 
 
 26
 To prove an attempt, the government must show: (1) the defendant intended to possess narcotics; and (2) the defendant took a substantial step toward the commission of the offense which step strongly corroborates the defendant's criminal intent. United States v. Mims, 812 F.2d 1068, 1077 (8th Cir.1987). Whether a defendant's conduct constitutes a "substantial step" depends on the surrounding factual circumstances. United States v. Garrett, 948 F.2d 474, 477 (8th Cir.1991). "Although the verbal formula for what constitutes a substantial step is clear, courts have not always found it easy to decide whether a defendant's conduct has crossed over the line from 'preparation' to 'attempt' ". United States v. Delvecchio, 816 F.2d 859, 861 (2d Cir.1987).
 
 
 27
 Dillibe argues that the only evidence of his involvement in the four ounce attempt was Gaines's identification of him as the source. Dillibe says that without some independent evidence that the four ounces of heroin existed, and that Dillibe took some action to procure or supply it, his conviction is unsound.
 
 
 28
 To sustain a conviction for aiding and abetting an attempt, the government must prove: (1) that the defendant associated himself with the unlawful venture; (2) that he participated in it as something he wished to bring about; and (3) that he sought by his actions to make it succeed. United States v. Duke, 940 F.2d 1113, 1117 (8th Cir.1991). Mere association with co-defendants or knowledge of their unlawful activities is insufficient. Id.
 
 
 29
 There was evidence here of more than Dillibe's mere association with Okenwa and Gaines and knowledge of the four-ounce transaction. Gaines said that Dillibe "was aware" of the sale, and when the deal fell through, Gaines blamed Dillibe for refusing to release the heroin. It is true that there was no evidence specifically identifying the source of the heroin or establishing the whereabouts of the four ounces; nevertheless, the evidence provided a reasonable explanation for these failures. A jury could reasonably infer that these failures were due to the fortuitous circumstance of the missing Nigerian cab driver--not Dillibe's reluctance to complete the deal.
 
 
 30
 For similar reasons, we reject Dillibe's argument that there was insufficient evidence to support his conviction on the attempted ten-ounce possession charge. He argues that his acts were merely preparatory and did not amount to a substantial step. He points out that the source for the ten ounces was never identified or even proven to exist, and that the heroin was never recovered. He says the uncorroborated testimony of Ek is insufficient evidence to convict.
 
 
 31
 This court held in Mims, 812 F.2d at 1079, that there was insufficient evidence to support a conviction on one count of use of a telephone to facilitate an attempt to possess heroin with intent to distribute. The evidence concerning the attempt consisted of testimony that the defendant called a known source of heroin, asked to arrange a meeting, set up a meeting, and said he wanted to take care of a prior drug debt. Id. at 1076. The meeting never took place, and the court held the phone call did not constitute a "substantial step." Id. at 1076 n. 6, 1079. We stressed that there were no discussions as to price or quantity, and the parties did not specifically discuss heroin except in connection with the prior drug debt. Id. at 1079. We also held, however, that in three other attempt counts, there was evidence constituting a "substantial step." Id. at 1078-79. In those counts, there was evidence that the defendant contacted a known source of heroin and tried to negotiate a deal. Id. The defendant offered the source definite sums of money and indicated that he had obtained increasingly larger sums of money to enable him to deal with the source. Id. at 1076. Although the deals were never consummated, it was because the source refused to deal with the defendant, and but for the source's refusal, the defendant's acts would have resulted in a crime. Id.
 
 
 32
 The evidence here is analogous to the three counts in Mims. Dillibe spoke a number of times with Ek regarding the ten-ounce deal. The two agreed to price and amount of heroin. Dillibe met with Ek on January 10, but could not complete the deal because he could not find the Nigerian cab driver holding his heroin. Dillibe declined Ek's offer to cancel the deal, and agreed to "split" the interest cost Ek was incurring on her loan to keep the deal alive. That the heroin was never recovered or the source identified is of little consequence. The jury could reasonably conclude from the evidence that Dillibe would have proceeded with the transaction, but for the missing cab driver.[5]
 
 
 33
 We affirm the convictions.
 
 
 
 [1]
 A 13-count indictment names the three, charging Gaines in seven of the counts, Okenwa in six of the counts, and Dillibe in nine of the counts. The charges were violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 845a (1988) (amended and recodified at 21 U.S.C.A. § 860 (1990)), 846, and 18 U.S.C. § 2 (1988). Okenwa and Gaines were acquitted on one of the heroin distribution charges. Gaines was sentenced to 87 months imprisonment, Dillibe 168 months, and Okenwa 110 months. The sentences were all the same as to each of the charges and were concurrent
 
 
 [2]
 The Honorable Robert G. Renner, United States District Judge for the District of Minnesota
 
 
 [3]
 Briggs was tried separately and convicted. This court affirmed his conviction and sentence. United States v. Briggs, 969 F.2d 689 (8th Cir.1992)
 
 
 [4]
 The entire instruction was as follows:
 The law recognizes several kinds of possession. A person may have actual possession or constructive possession. A person may have sole or joint possession.
 A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it.
 A person who, although not in actual possession, has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.
 If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.
 Whenever the word "possession" has been used in these instructions, it includes actual as well as constructive possession and also sole as well as joint possession.
 
 
 [5]
 In his reply brief, Dillibe cites United States v. Harris, 733 F.2d 994 (2d Cir.1984), to support his stance that proof of an unsuccessful deal unaccompanied by proof that heroin actually existed cannot form the basis for a conviction of an attempt charge. Here, however, the evidence supplied an ample explanation for Dillibe's failure to actually possess the heroin, and demonstrates that he intended to possess the heroin. These circumstances are not the same as in Harris, in which there was evidence that one of the defendants was a broker who might not ever possess the heroin, id. at 1002, and the other was a seller who although he attempted to distribute, did not necessarily attempt to possess. Id. at 1003