**UNITED STATES of America, Appellee,**

v.

**Alex Derwin HORNE, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Joseph Jon FRANKLIN, Appellant.**

**Nos. 93–1130, 93–1131.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1993.

Decided Aug. 31, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 16, 1993.

F. Clayton Tyler, Minneapolis, MN, argued and briefed (Hersch Izek, on the brief), for appellant Alex Horne.

Bruce H. Hanley, Minneapolis, MN, argued and briefed (Lisa D. Dejoras, on the brief), for appellant Joseph Jon Franklin.

Byron T. Jones, Minneapolis, MN, argued (Francis X. Hermann and B. Todd Jones, on the brief), for appellee.

Before JOHN R. GIBSON, MAGILL, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Alex Derwin Horne and Joseph Jon Franklin appeal their convictions on federal drug and firearm charges. They challenge

the constitutionality of various searches and seizures of evidence, and contend that their conviction by an all-white jury was constitutionally infirm. Both appellants also argue that their convictions on certain counts were not supported by sufficient evidence. In addition, Franklin maintains that his trial should have been severed from Horne's and that his sentence should not have been enhanced for his role in the conspiracy.

On June 4, 1992, Minneapolis Police Officers executed a search warrant for a house occupied by Horne at 1325 James Avenue in Minneapolis. After obtaining the search warrant but prior to its execution, Officer Tim Trebil contacted a member of the police department's narcotics unit to obtain additional information regarding Horne's suspected drug trafficking activities. Officer Chris Hauglid of the narcotics unit told Trebil that the narcotics unit had been conducting an ongoing investigation into Horne's activities and that he drove a white mini-van that he used in his drug business. When they arrived to execute the warrant, officers saw the mini-van parked on the street directly in front of the house at 1325 James. Soon after gaining entry to and securing the house, officers found Horne, a Colt 9˙mm semi-automatic pistol, and approximately $6000 cash in the living room. They also found a Calico M950 9 mm semi-automatic weapon in an upstairs bedroom. After confirming that the white mini-van parked outside was registered to Horne, Officer Trebil ordered it impounded. Officer Trebil took the van keys from a living room table, gave them to another officer who was assisting in the search, and directed him to tow the mini-van. Consistent with standard operating procedures, the officer began an inventory search. He immediately saw a clear plastic bag containing what appeared to be crack cocaine tucked in the interior handle of the van's door. The officer seized the cocaine and completed the impound search of the van's interior. Police subsequently obtained a warrant for a detailed search of the van. No additional drugs were recovered in the second search, but a box of plastic baggies was seized.

On July 16, 1992, a second search warrant was executed at 1325 James Avenue. This federal warrant, executed by U.S. marshals, authorized a search of the house for Perry Horton, a fugitive from Mississippi for whom the marshals also had an arrest warrant. Following an announced entry into the house, the law enforcement officers found four individuals, two of whom were subsequently identified as Horne and Horton, seated and sleeping in a first-floor room. In conjunction with securing these individuals, law enforcement officers looked under the furniture where the individuals had been seated, and they conducted a security sweep of the rest of the house. Deputy U.S. Marshal Mark Postudensek discovered six ounces of cocaine, several rocks of crack cocaine, and a scale under the cushions of the loveseat in the room where Horne was arrested. In response to their query, Horne told the deputy marshals that he had a gun in his upstairs bedroom, and they recovered the weapon, a Ruger 9 mm semi-automatic weapon. After Horne was advised of his *Miranda* rights, he consented to a search of the entire upstairs bedroom where a large roll of cash and a loaded 9 mm ammunition clip were subsequently found.

Following this cocaine seizure, the Drug Enforcement Administration ("DEA") became involved in the investigation, and DEA agents obtained information regarding the source of the cocaine through witness interviews. Perry Horton described the source as a tall, well-built African–American male with short hair. Horton said the source was called "Mack", was from Los Angeles, and was driving a blue, late-model car. Later that same day, while federal officers were executing a third search warrant that permitted a more detailed search of the house, a DEA agent observed a man, subsequently identified as Joseph Jon Franklin, who matched the physical description of the source. He drove up to the house in a blue, late-model car. The man walked toward the front door, but before he reached the house, he appeared to speak to neighbors and then turned and walked away. DEA agents stopped the man, identified themselves as police officers, and requested that he come into the house. He complied, and when the

agents asked his name, he replied "Mack". When asked where he was from, he told them California. The agents arrested Franklin and searched both him and his car. They found no drugs or sums of money but did seize a number of documents before returning the car to the agency where Franklin had rented it.

Prior to selection of a jury, both defendants, who are African–American, challenged the entire panel on the grounds that it lacked any persons of color. The district court denied the joint motion.

Several items seized during the various searches were admitted into evidence during the trial. The evidence included approximately 12.6 grams of crack cocaine, which was recovered along with two pagers, a box of plastic baggies, and $76 from inside Horne's mini-van on June 4, 1992. Horton testified that the crack cocaine in the mini-van was placed there by Horne, who had returned to 1325 James Avenue with Horton just minutes before execution of the search warrant. Two weapons and a large amount of currency were found in the house on June 4, 1992, and Officer Trebil testified that a loaded semi-automatic weapon and more than $6000 were found in the living room near Horne. A digital gram scale was recovered in the kitchen area. Minneapolis police retrieved a second weapon from Horne's upstairs bedroom, along with a shoulder holster, pager, and more than 150 rounds of ammunition. Horne had admitted ownership of the gun found in his bedroom at the time of his June 4, 1992 arrest. Police also recovered a Western Union money transfer receipt from Horne to Joseph Franklin in Los Angeles, reflecting a transfer of $3000 on May 28, 1992.

Certain evidence seized on July 16, 1992, was also admitted during the trial. Deputy Marshal Postudensek testified about his discovery of both powder and crack cocaine, as well as a digital gram scale, all found near Horne under a loveseat in the living room. These items were admitted into evidence, along with the semi-automatic pistol found in Horne's bedroom. More than $3000 in cash was found in Horne's bedroom, along with several loaded ammunition clips. Numerous documents and bills found in the house verified Horne's occupancy of it, as well as Horne's use of a pager that was recovered.

Perry Horton offered trial testimony of his knowledge of Horne's drug dealing and of Horne's relationship with Franklin. Horton testified that he knew Horne by the nickname "Bo" and Franklin by the nickname "Mack". Horton stated that while living at 1325 James Avenue between May and July, 1992, he saw Franklin at the house frequently, including Franklin's last visits during the week of July 11, 1992. Horton testified that sometime during that week he saw Horne give Franklin approximately $20,000. Franklin came to Horne's house three or four times during that week, and on the evening of July 15, 1992, Horton saw Franklin arrive at 1325 James Avenue in the blue rental car. Horton testified that he saw Franklin give Horne a black bag outside of the house and that he later saw Horne taking cocaine out of the black bag and "cooking up" crack. Horton testified that from the late evening hours of July 15 and into the early morning of July 16, a number of individuals came to 1325 James Avenue to purchase various quantities of both powder and crack cocaine. Finally, Horton testified that just prior to the entry of law enforcement officers into the house on the morning of July 16, 1992, he saw Horne remove something from his pants and hide it under a cushion.

Several documents recovered from Franklin were also admitted into evidence. Inside the blue rental car agents found several one-way tickets, purchased with cash, from Los Angeles, California, through Houston, Texas, to Minneapolis, Minnesota, in the name of Darrell Lawson. The tickets apparently reflected Franklin's trips to Minneapolis on June 8 and July 11, 1992. An electronic notebook containing Horne's pager number and home phone number was also found with Franklin's possessions. Additional documents, including a receipt from a gun shop in Los Angeles, California, found on Franklin were admitted into evidence. A receipt from the same Los Angeles gun shop was found with Horne's possessions during the June 4, 1992 search.

Finally, Special Agent John Boulger, an experienced criminal investigator with the Minnesota Bureau of Criminal Apprehension, testified as an expert during trial. A long-time narcotics investigator, Boulger provided information on sources of cocaine and distribution patterns, drug courier techniques, methods of communication between drug traffickers, and the use of firearms in the drug trade. Boulger testified that drug trafficking is primarily a cash business and provided several examples of how currency is commonly transferred between those involved.

The jury convicted Horne on six counts, including operating a "crack house" near a protected area (21 U.S.C. §§ 856, 860); conspiring to possess with intent to distribute crack within a protected area (21 U.S.C. § 860); possession with intent to distribute cocaine within a protected area (21 U.S.C. § 860); and use of a firearm to facilitate a drug trafficking crime (18 U.S.C. § 924(c)(1)). The jury convicted Franklin of conspiring to possess with intent to distribute cocaine (21 U.S.C. § 846), and distribution of cocaine within 1,000 feet of a school (21 U.S.C. §§ 841, 860).

## I.

■ Horne argues that the searches of his mini-van on June 4, 1992, and of his home on July 16, 1992, violated his Fourth Amendment rights and that the items seized should not have been admitted into evidence. We first consider the mini-van search. Under the so-called automobile exception, an automobile on a public street may be searched without a warrant as long as the searching agents have probable cause to believe evidence of a crime will be found in the vehicle. *United States v. Ross*, 456 U.S. 798, 808, 102 S.Ct. 2157, 2164, 72 L.Ed.2d 572 (1982); *see also United States v. Martin*, 806 F.2d 204, 207–08 (8th Cir.1987). "Probable cause for an automobile search exists if the facts and circumstances known by the police when they begin the search are 'sufficient in themselves' for a person 'of reasonable caution' to believe that contraband or evidence of criminal activity was in the vehicle." *See United States v. Caves*, 890 F.2d 87, 90 (8th Cir.1989) (citing

*Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949)). The assessment of probable cause is to be based on objective facts that would justify issuance of a warrant. *Ross*, 456 U.S. at 808, 102 S.Ct. at 2164. In this case, Officer Trebil obtained certain information about Horne's drug trafficking activities before he led the execution of the search. When Trebil ordered the search of the van, he was relying on narcotics department information that drugs had been purchased inside 1325 James; that an informant had told narcotics officer Hauglid that an occupant of the house known as Alex Horne delivered drugs in his white mini-van and that he would likely have six ounces of cocaine in his possession; that a white mini-van parked in front of 1325 James was registered to Alex Horne; and that the keys to the mini-van were located on a table immediately in front of Horne inside of 1325 James. The Magistrate Judge denied Horne's motion to suppress the cocaine found in the van because, he concluded, Officer Trebil had probable cause to believe that evidence of a crime would be found inside Horne's white mini-van.

■ In attacking this decision, Horne notes that he had transferred title to the van to his wife the day before the search. This alone is insufficient to undermine the conclusion that the officers had probable cause to search the mini-van. Horne also challenges the credibility of the confidential informant who told Officer Hauglid that Horne used his mini-van to deliver drugs and that Horne would likely have six ounces of cocaine in his possession at about the time the warrant was executed at 1325 James. Horne considers significant Officer Trebil's lack of personal knowledge regarding the informant. Because probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication, *see United States v. Rich*, 795 F.2d 680–82 (8th Cir.1986); *United States v. Briley*, 726 F.2d 1301, 1305 (8th Cir.1984), Officer Trebil's lack of first-hand knowledge is irrel-

evant. Under cross-examination at the suppression hearing, Officer Trebil testified that he knew Officer Hauglid had worked extensively with the informant and that he had proved reliable and accurate. The Magistrate Judge considered this, along with Trebil's other knowledge at the time he ordered the mini-van impounded, sufficient to constitute probable cause, and we cannot say that this finding is clearly erroneous.

## II.

■ Horne next argues that evidence seized from the loveseat on July 16, 1992, should be suppressed because the scope of the search exceeded that which was justified as incident to arrest. Police may conduct a warrantless search incident to a lawful arrest, even absent probable cause or reasonable articulable suspicion. *See New York v. Belton,* 453 U.S. 454, 458–61, 101 S.Ct. 2860, 2863–65, 69 L.Ed.2d 768 (1981); *Chimel v. California,* 395 U.S. 752, 760, 89 S.Ct. 2034, 2038–39, 23 L.Ed.2d 685 (1969). Officers may conduct a limited protective sweep of an arrestee's home following an in-home arrest if they have a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those at the arrest scene. *Maryland v. Buie,* 494 U.S. 325, 334–36, 110 S.Ct. 1093, 1098–99, 108 L.Ed.2d 276 (1990). Horne contends that the search of the loveseat was outside the scope of a such a protective sweep because he and three others in the house had already been hand-cuffed at the time the sweep was made. This court in *United States v. Lucas,* 898 F.2d 606 (8th Cir.), *cert. denied* 498 U.S. 838, 111 S.Ct. 112, 112 L.Ed.2d 81 (1990), held that a search of a cabinet in a small kitchen, made immediately after hand-cuffing defendant and while removing him from the kitchen, was a valid search incident to the defendant's arrest. In that case, the defendant had been trying to reach the cabinet door immediately prior to his struggle with the arresting officers, and two of his friends, who had not been hand-cuffed, were still at the kitchen table when the search took place. *Id.* at 609. In *Lucas,* we were persuaded by cases from other circuits in which searches immediately following the hand-cuffing of arrestees were upheld.

*See United States v. Queen,* 847 F.2d 346, 352–54 (7th Cir.1988); *United States v. Silva,* 745 F.2d 840, 847 (4th Cir.1984) *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985); *United States v. Fleming,* 677 F.2d 602, 606–08 (7th Cir.1982). We stated that, while it is possible that a search incident to an arrest be "undertaken too long after the arrest and too far from the arrestee's person … it does not makes sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures." *Lucas,* 898 F.2d at 610 (quoting *Fleming,* 677 F.2d at 607).

■ Here we conclude that the search was valid as incident to the arrest. When the law enforcement officers entered the house on July 16, 1992, they had no way of knowing how many people were there. When the four deputy U.S. marshals and two Minneapolis Police Officers entered the house, they immediately split up to cover as much area as possible. While Deputy Marshal Kelly Sullivan was in the living room securing Horton and another individual, the two Minneapolis Police Officers were securing the upstairs area of the house, and two other deputy marshals were apparently elsewhere in the house, Deputy Postudensek entered the living room from a rear door and found Horne and another man seated in a loveseat and chair. Immediately after hand-cuffing both of them, he turned over the cushions of the loveseat and chair, where he found the cocaine and scale that Horne sought to exclude from evidence. At about the time Deputy Postudensek found the cocaine, the Minneapolis officers returned downstairs and helped Deputy Sullivan secure the other two individuals. At the time Deputy Postudensek looked under the furniture cushions, he did not know that the rest of the house had been secured. The deputy marshals and other law enforcement personnel had entered the house less than two minutes earlier, and Deputy Marshal Postudensek had just hand-cuffed the two men. *See United States v. McConney,* 728 F.2d 1195, 1207 (9th Cir. 1984) (en banc) (holding presence of several agents with guns drawn on arrestee "was no guarantee that armed violence could not break out when a loaded gun was only two

feet away"). Under the circumstances, Deputy Marshal Postudensek could reasonably have believed that weapons were within reach of the hand-cuffed detainees or others in the house who had not yet been detained. The protective sweep was constitutional under *Maryland v. Buie* and *Lucas,* and we therefore affirm the district court's decision to admit the evidence.

### III.

 Horne next argues that his conviction on two counts of possession of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c), was not supported by sufficient evidence. Conviction under 18 U.S.C. § 924(c) requires separate findings that the defendant possessed a firearm and that it was possessed during or in relation to a drug trafficking crime. *United States v. Lyman,* 892 F.2d 751, 752 (8th Cir.1989) *cert. denied,* 498 U.S. 810, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990). This court has recognized that the presence and availability of a weapon permits the jury to infer an intent to "use" the weapon should there be an "evident need." *United States v. Thomas,* 964 F.2d 836, 838 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 265, 121 L.Ed.2d 195 (1992). "Use" of a weapon in relation to drug trafficking offense under 18 U.S.C. § 924(c)(1) includes the presence and ready availability of a firearm at a house where drugs are dealt. *United States v. Sykes,* 977 F.2d 1242 (8th Cir.1992). The weapon need not be brandished or fired, *United States v. Matra,* 841 F.2d 837, 843 (8th Cir.1988), nor must it be located in the room where the drug transaction occurs. *See United States v. Bennett,* 956 F.2d 1476 (8th Cir.1992); *United States v. LaGuardia,* 774 F.2d 317, 321 (8th Cir.1985) (pistol in bedroom, pistol on shelf in closet, rifle in truck of car outside; cash, cocaine and drug-related items discovered elsewhere on premises).

 In considering this sufficiency-of-evidence question, we must view the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences that may logically be drawn from it. *See United States v. Resnick,* 745 F.2d 1179, 1185 (8th Cir.1984). Horne now denies both actual and constructive possession of the weapons at issue: a .380 Colt semi-automatic pistol discovered near him in the living room and the Calico M950 9mm semi-automatic weapon found in his upstairs bedroom, both on June 4, 1992, as well as the Ruger 9 mm semi-automatic pistol found in his bedroom on July 16, 1992. At the time they were discovered, however, Horne claimed ownership of both the Calico M950 and the Ruger 9mm weapons. The colt .380 was found near Horne at the time of the June 4 search, along with more than $6000 in cash. Outside in Horne's mini-van on that date, 12.6 ounces of cocaine were recovered. At the time the Ruger 9mm pistol was discovered, more than six ounces of powder and crack cocaine were found near Horne, along with nearly $3000 in cash. Given this evidence, the jury could draw a reasonable inference that the weapons were possessed during and in relation to a drug trafficking crime, and we decline to disturb their findings.

### IV.

Both Horne and Franklin maintain that they were denied their Fourteenth Amendment right to equal protection and their Sixth Amendment right to due process because the jury that convicted them included no African–Americans and because the jury was selected from a venire that did not represent a fair cross-section of the community. Horne and Franklin raised this issue during the jury selection process and in post-trial motions. We agree with the district court that racial composition of the venire did not violate appellants' constitutional rights.

 The Sixth Amendment guarantees a criminal defendant a criminal trial "by an impartial jury of the state and district wherein the crime shall have been committed." The Supreme Court has previously interpreted this amendment to guarantee a criminal defendant a jury drawn from a source fairly representative of the community. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To establish a violation of this "fair cross-section" requirement, ap-

pellants must show (1) that the group alleged to have been excluded is a "cognizable" or "distinctive group" within the community; (2) that representation of this group in venires was not fair and reasonable in relation to the number of such persons in the community; and (3) that the under-representation was due to the systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Here appellants have established only the first item, that African–Americans are a cognizable and distinctive group. *See United States v. Douglas,* 795 F.Supp. 909, 912 (N.D.Iowa 1991).

■ Appellants present certain statistics in support of their case. They note that while no African–Americans were on the panel from which their jury was chosen, 1.4% of the District of Minnesota's Fourth Division venire during September and October, 1992, was composed of African–Americans, although 2.9% of the population in the Fourth Division is black. In *United States v. Whitley,* 491 F.2d 1248, 1249 (8th Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974), this court found a similar statistical deviation "simply too slight to establish a prima facie case of knowing and intentional exclusion." While the Constitution forbids "wheels, pools of names, panels, or venires . . . [that] systematically exclude distinctive groups in the community", it does not mandate that every jury that tries a criminal defendant "must mirror the community". *Taylor,* 419 U.S. at 538, 95 S.Ct. at 702. Appellants have failed to present adequate evidence that the representation of African–Americans in the venire was not fair and reasonable in relation to the admittedly small number of African–Americans in the District of Minnesota's Fourth Division.

The third *Taylor–Duren* requirement, a showing that the particular jury pool plan utilized is being administered in a deliberately discriminatory manner, *see Brown v. Lockhart,* 781 F.2d 654, 657 (8th Cir.1986), is similarly unsatisfied here. "[E]vidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion", *United States v. Womack,* 985 F.2d 395, 397–98 (8th Cir.1993) (citation omitted), and the discrep-

ancy on their panel—a statistically slight one—is all appellants have shown. For these reasons, we find that appellants have failed to show a violation of the Sixth Amendment.

■ In order to make out a prima facie case of an equal protection violation in the composition of a jury, a defendant must show that an identifiable, distinct class has been substantially under-represented in the source from which jurors have been drawn over a significant period of time. *See Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Here we have already concluded as part of our Sixth Amendment analysis that the deviation between the percentage of African–Americans in the community and the percentage of African Americans in the venire—only 1.5%—was not substantial. Furthermore, appellants have not attempted to show that any deviation was substantial over a period of time. We therefore conclude that appellants have failed to show that the jury selection process violated their right to equal protection.

### V.

Franklin argues that the evidence seized from his rental car on July 16, 1992, was improperly admitted at trial. Specifically, Franklin maintains that the police officers had no "reasonable and articulable basis" for the investigative stop during his visit to the house at 1325 James on that date. He contends also that the subsequent search of his car violated his Fourth Amendment right.

■ Police may briefly stop and question a person whom they reasonably suspect of criminal activity. *Terry v. Ohio,* 392 U.S. 1, 20–23, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968); *United States v. Abhokai,* 829 F.2d 666, 669–70 (8th Cir.1987), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1082, 99 L.Ed.2d 241 (1988). The law enforcement agents must identify particular facts and rationally draw inferences from those facts that, when viewed under the totality of the circumstances, create a reasonable suspicion of criminal activity. *United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989). In this case, the DEA

agents who stopped Franklin did so after Perry Horton described as the drug source a man called "Mack" whose description Franklin fit: a well-built African–American man driving a late-model, blue car. When this man approached 1325 James, where cocaine had been seized only a few hours earlier, the police were justified in making a *Terry* stop.

After complying with the agent's request to come into the house, Franklin responded to the agent's queries, identifying himself as "Mack" and saying he was from California. Again, both answers were consistent with what agents knew of the drug source, and we agree that at this point the agents had probable cause for a warrantless arrest. That is, agents had reasonably trustworthy information that justified a prudent person believing that the person detained had committed an offense. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142 (1964); *United States v. Danielson,* 728 F.2d 1143, 1146 (8th Cir.), *cert. denied,* 469 U.S. 919, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984). In establishing probable cause, law enforcement officials enjoy substantial latitude in interpreting and drawing inferences from factual circumstances. *See United States v. Tussa,* 816 F.2d 58, 62 (2d Cir.1987). Here the district court concluded that numerous details of the "tip" regarding Franklin were corroborated by independent police investigation, and considering the totality of circumstances, we agree that the arrest was constitutional.

The blue rental car in Franklin's possession was searched following his arrest. The government relied upon the information just discussed in determining that they had probable cause to make a warrantless search of the car under the so-called automobile exception. *See California v. Acevedo,* — U.S. —, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). Again, probable cause for an automobile search exists if the facts and circumstances known to the police when they began the search were "sufficient in themselves" for a person of "reasonable caution" to believe that contraband or evidence of criminal activity was in the vehicle. *United States v. Caves,* 890 F.2d 87, 90 (8th Cir.1989). Given the events and knowledge leading to the search of the car, as recited above, we find that the car search was constitutional.

## VI.

Franklin next argues that the evidence presented was insufficient to sustain his conviction for conspiracy to possess with intent to distribute more than six ounces of cocaine in violation of 21 U.S.C. § 846 and for distribution of cocaine within 1000 feet of a school, in violation of 21 U.S.C. §§ 841 and 860. In order to convict Franklin of conspiracy in violation of sections 841(a)(1) and 846, the government had to prove that he entered into an agreement with Horne to distribute narcotics. *United States v. Gaines,* 969 F.2d 692, 696 (8th Cir.1992). The government did not have to show an overt act, *id.,* or a formal agreement. *United States v. Wint,* 974 F.2d 961, 968 (8th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1001, 122 L.Ed.2d 151 (1993). A tacit understanding proved wholly by circumstantial evidence or by inferences from the appellants' actions is sufficient. *Id.*

As noted above, when considering a sufficiency-of-evidence question, we view the evidence in the light most favorable to the verdict and accept all reasonable inferences supporting the conviction. *See United States v. Holt,* 969 F.2d 685, 687 (8th Cir.1992). Evidence of Franklin's behavior was provided both by Perry Horton's testimony and by circumstantial evidence. Physical evidence admitted at trial included plane tickets, gun shop receipts, a Western Union money transfer receipt, and an electronic notebook with Horne's home and pager numbers. This evidence, connecting Franklin to the conspiracy to distribute cocaine during the summer of 1992, was corroborated by Perry Horton's testimony, as well as by Franklin's presence at 1325 James Avenue on July 16, 1992. Given this considerable evidence, we are unwilling to disturb the jury verdicts convicting Franklin on these counts.

## VII.

Franklin also contends that he was prejudiced by the joint trial with Horne and that the district court erred in denying his motion for a separate trial under Rule 14 of the

Federal Rules of Criminal Procedure. Franklin argues that because he was not linked to the events of June 4 nor to the firearms charges, evidence relating to these charges unduly prejudiced his case.

 A district court's refusal to grant severance must be upheld absent a showing of clear prejudice that indicates an abuse of discretion. *United States v. Searing*, 984 F.2d 960, 965 (8th Cir.1993). To show prejudice, a defendant must establish something more than the mere fact that his or her chances for acquittal would have been better had he been tried separately. *See United States v. Wint*, 974 F.2d 961, 966 (8th Cir. 1992) (citation omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 1001, 122 L.Ed.2d 151 (1993). The defendant must "[a]ffirmatively demonstrate that the joint trial prejudiced his right to a fair trial." *Id.* Franklin has not presented any such affirmative evidence here. Given the federal system's preference for joint trials of those indicted together, *see Zafiro v. United States*, —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), and the existence here of allegations of a comprehensive scheme encompassing several defendants and multiple offenses, joinder of the charges against Horne and Franklin was proper under Rule 8 of the Federal Rules of Criminal Procedure, and the district court properly denied the motion to sever.

### VIII.

 Finally, Franklin argues that the district court erred in determining that he played a leadership or organizational role in the conspiracy and in enhancing his sentence by two levels. The United States Sentencing Guidelines provide for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than [one involving five or more participants]." U.S.S.G. 3B1.1(c). The definition of leadership or organizational role is broad, *see United States v. Manuel*, 912 F.2d 204, 207 (8th Cir.1990), and it does not require that the defendant had direct control over others in the conspiracy. *United States v. Adipietro*, 983 F.2d 1468, 1478 (8th Cir. 1993) (citations omitted). Unable to say that the district court's factual finding was clearly

erroneous, *see United States v. Phillippi*, 911 F.2d 149, 152 (8th Cir.1990), *cert. denied*, 498 U.S. 1036, 111 S.Ct. 702, 112 L.Ed.2d 691 (1991), we affirm the sentence.

### IX.

For these reasons, we affirm.