# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-2958
_____

United States of America

*Plaintiff - Appellee*

v.

William Meyer

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids
_____

Submitted: June 17, 2021
Filed: December 2, 2021
_____

Before GRUENDER, BENTON, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

While talking with William Meyer outside his home, federal agents grew worried that, if he went back inside, he would destroy evidence. Rather than take that risk, they entered his home without a warrant and took two computers, a

cellphone, and a hard drive. The main question in this case is whether their actions violated the Fourth Amendment. We agree with the district court[1] that they did not.

I.

As part of an investigation named "Operation Dark Room," federal agents discovered financial ties between Meyer and individuals in the Philippines who were livestreaming sex acts involving children. To gather more information, two agents decided to visit Meyer at his home and knock on his door. During the course of the conversation, which took place in the agents' car, Meyer revealed a number of facts that aroused suspicion, including that he had personal and financial ties to the individuals involved in the abuse. When he further admitted that he used a computer and cellphone to contact them, the agents asked if he would be willing to turn those devices over for an examination.

Rather than categorically refusing, Meyer said he was willing to hand them over later, after he had a chance to "check [his] email and stuff." Once the agents expressed concern that a delay would give him a chance to erase what was on them, Meyer still refused to consent, this time because his house was "a mess" and "not . . . in any condition to entertain people." So after further discussion, he went back inside.

At that point, the agents sprang into action. Worried that Meyer would destroy evidence if they waited any longer, one of the agents called a prosecutor for advice on whether "an exigent circumstance existed." When he was told that it did, the agents again knocked on Meyer's door; searched his home for electronic devices; and seized two computers, a cellphone, and a hard drive. One of the agents then successfully applied for a search warrant.

---

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

The search revealed a hoard of child pornography. The hard drive, for example, contained videos of minors performing sex acts on Skype, with Meyer shown watching in the corner of the screen. It also contained a number of lewd messages between Meyer and a minor girl, as well as evidence that he had sent money in exchange for the videos.

The evidence spelled trouble for Meyer, who moved to suppress everything the agents found. The district court denied the motion; accepted his conditional plea to one count of sexual exploitation of children, *see* 18 U.S.C. § 2251(a), (e); and sentenced him to 30 years in prison. On appeal, he challenges both the denial of his motion and the length of his sentence.

II.

The default rule for entering a home to search and retrieve evidence is to get a warrant first. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). But when there is "a sufficient basis" to suspect that incriminating evidence will be destroyed, *United States v. Ramirez*, 676 F.3d 755, 760 (8th Cir. 2012), exigent circumstances exist, and the presence of probable cause allows officers to enter and search the home without one. The lone exception is when the officers themselves have created the exigency by "engaging or threatening to engage in conduct that violates the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 462 (2011).

Meyer challenges the warrantless entry into his home at every step in this analysis. First, he claims that there was no probable cause. Second, he denies the existence of an exigency. And third, even if an exigency existed, he claims the agents created it. Each of these "challenges fall[s] into [the legal-question] category, so our review is de novo." *United States v. James*, 3 F.4th 1102, 1104 (8th Cir. 2021).

A.

On these facts, probable cause is not a close call. It "exists when[ever] . . . a reasonable person could believe [that] there is a fair probability that . . . evidence of a crime w[ill] be found" in the place to be searched. *Kleinholz v. United States*, 339 F.3d 674, 676 (8th Cir. 2003) (per curiam) (quotation marks omitted).

By the time the agents decided to enter Meyer's home, they had probable cause. *See Kaley v. United States*, 571 U.S. 320, 338 (2014) (explaining that probable cause "is not a high bar"). They knew that he: (1) had ties to the individuals who were livestreaming the abuse; (2) had stayed with them when he visited the Philippines; (3) had paid thousands to them and one of the minor victims; and (4) did not tell his wife about some of the money he sent, despite claiming that the payments were tied to his humanitarian work. It was not much of a leap from there to conclude that there was a "fair probability" that he was involved. *See United States v. Horne*, 4 F.3d 579, 589 (8th Cir. 1993) (explaining that officers have "substantial latitude" to draw "inferences" from what they know).

The same goes for the possibility that there would be incriminating evidence on Meyer's devices. *See United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (explaining that there must be "a nexus between the [illegal activity] and the place to be searched"). Meyer had already admitted to the agents that he used a computer and cellphone to communicate with the abusers and had stayed in regular contact with them. The agents also knew that his Skype username was "prettyvirginfilipino" and that the profile he used was a variant of the first name of one of the minor victims. Given that Meyer had already admitted that the devices were in his home, there was at least "a fair probability" that the agents would find "evidence of a crime" inside. *Kleinholz*, 339 F.3d at 676.

Just because Meyer had an innocent explanation for *some* of these facts did not mean the officers had to believe him. As the Supreme Court has put it, "probable cause does not require [officers] to rule out a suspect's innocent explanation for

suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). And here, the "circumstances" were suspicious enough that the agents could have reasonably concluded there was a "substantial chance" that Meyer was involved in "criminal activity," not charitable work. *Id*. at 586.

B.

Though a closer call, the agents also faced an exigency: they had a "sufficient basis" to reasonably believe that Meyer would "imminently destroy evidence." *Ramirez*, 676 F.3d at 760; *see also United States v. Knobeloch*, 746 F.2d 1366, 1367 (8th Cir. 1984). Meyer's suspicious answers, including his insistence that he have time alone with his devices before the agents could see them, is what led to a sense of urgency, a "now[-]or[-]never" scenario. *Riley v. California*, 573 U.S. 373, 391 (2014) (quoting *Missouri v. McNeely*, 569 U.S. 141, 153 (2013)); *see also United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (observing that a suspect's "conduct" can create the exigency).

Consider what Meyer said and did. When asked whether he would allow an examination of his computer, he initially said no because he used it "all the time." Then, despite his professed need for it, he offered to let the agents examine it later, after he "check[ed] [his] email and stuff."

From there, Meyer's responses only became more suspicious. When the agents suggested that they accompany him inside and look at the devices together, his attention shifted to the tidiness of his house. His "house [was] a mess," he said, so he would need "a few minutes to clean up." And then, rather than remaining outside as requested while one of the agents made a call, Meyer instead went inside.

Knowing that data can be deleted at the touch of a button, the agents decided that they needed to act fast. *See Riley*, 573 U.S. at 391. Given Meyer's insistence that he have an opportunity to be alone with his devices first, they reasonably concluded that he was hiding something. And if they were to wait to conduct the

search, as he had suggested, the something that he did not want them to see would be gone.[2]  So the agents reasonably determined that it was "now or never": "search . . . immediately," or forever lose their chance.  *See Riley*, 573 U.S. at 391 (quotation marks omitted).

## C.

It should also be clear by now that the agents did not create the exigency "by engaging or threatening to engage in conduct that violates the Fourth Amendment." *King*, 563 U.S. at 462.  Knocking on a suspect's door to ask questions, a so-called "knock and talk," has long been a valid investigative technique, *see United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008), so Meyer's argument focuses on what happened next.

### 1.

After the agents knocked on his door, Meyer insisted on speaking with them outside, so the conversation took place in the agents' car.  Toward the end, one of the agents told Meyer that, "if I suspect that something's going on, . . . I can't just let people go in and have an opportunity to . . . destroy potential evidence."  Then, after the possibility of getting a warrant came up and Meyer suggested that they come back later, the same agent said, "I'm not gonna tell you when I want it.  I'll come over, I'll knock on the door, and we'll . . . go from there."  According to Meyer, these two statements created the exigency by planting the idea of destroying

---

[2]Meyer did more than just "stand on [his] constitutional rights."  *King*, 563 U.S. at 470; *cf. Ramirez*, 676 F.3d at 762–64 (concluding that there were no exigent circumstances when the suspect merely declined to let the officers enter and then shut the door on them).  Rather, he gave suspicious answers that led the agents to reasonably conclude that he wanted time alone with the devices for a reason he could not say out loud: to destroy evidence.  *See United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005) (noting that officers may draw reasonable inferences when evaluating whether exigent circumstances exist).

evidence in his mind and threatening to take his property at any time, with or without a warrant.

The most obvious problem with Meyer's theory is timing. By that point, Meyer had already made a number of suspicious comments, including offering multiple excuses for his refusal to cooperate. For the agents to have caused the exigency, they must have "manufacture[d]" or "create[d]" it. *Ramirez*, 676 F.3d at 761 n.3 (quotation marks omitted). They could not have manufactured or created an exigency that *already* existed.

Nor did either statement threaten to violate Meyer's Fourth Amendment rights. *See King*, 563 U.S. at 462. The first was just a response to his attempts to persuade the agents to return for the devices. And the second merely explained that, if the agents were to come back with a warrant, the search would not, as the district court put it, "be scheduled at [his] convenience."

2.

Nothing else the agents did that day created an exigency either. Meyer suggests that they spoke it into existence by raising the possibility that he would destroy evidence. But hypothesizing about what *Meyer* might do is not the same as threatening to engage in conduct that would violate his constitutional rights. *See id.* at 462. Besides, the agents were only saying out loud what they reasonably suspected was true based on what he had already said. His *responses*, in other words, are what created the exigency.

For similar reasons, the agents did not have to "act" like "members of the general public" when they spoke to him. Just because asking tough questions and closely scrutinizing the answers could lead a suspect to destroy evidence does not mean that someone else created the exigency. *See United States v. Newman*, 472 F.3d 233, 238–39 (5th Cir. 2006) (explaining that officers did "not manufacture an exigency by employing a legitimate investigative tactic"). Rather, the agents in this

case would have needed to do something more: "engag[e] or threaten[] to engage in conduct that violate[d] the Fourth Amendment." *King*, 563 U.S. at 462.

\* \* \*

Long story short: probable cause existed, the exigency was real, and it was not of the agents' making. So even though the search was warrantless, it did not violate the Fourth Amendment.

III.

Nor do we need to remand for resentencing, even though the district court mistakenly told Meyer that he had "to persuade the court to vary downward." Meyer did not object at the time, so our review is for plain error. *See United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) (en banc). Even assuming this statement was erroneous and that any error was plain, it did not affect Meyer's substantial rights. *See United States v. Henson*, 550 F.3d 739, 740 (8th Cir. 2008) (explaining that treating the advisory range as presumptive is "significant procedural error," but holding that the error may still be harmless (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

The remainder of the record makes clear that this statement did not play a role in the district court's analysis. The court stated, for example, that it had "considered all the [statutory sentencing] factors," including Meyer's "horrendous, egregious victimization of vulnerable victims," in an effort to "arriv[e] at a sentence that [was] sufficient but not greater than necessary to achieve the goals of sentencing." *See* 18 U.S.C. § 3553(a). It then went on to explain that there was no reason to vary downward because "the aggravating factors . . . vastly outweigh[ed] the mitigating factors." Given these other comments, we conclude that, even if the court erred, there is no "reasonable probability" that it affected Meyer's sentence. *United States v. Cottrell*, 853 F.3d 459, 463 (8th Cir. 2017).

## IV.

We accordingly affirm the judgment of the district court.

_____