# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2694

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Pamela Kuenstler, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 02-2748

_____

Appeals from the United States
District Court for the Western
District of Missouri.

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Gregory A. Hill, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted: January 15, 2003

Filed: April 15, 2003

_____

Before WOLLMAN and MURPHY Circuit Judges, and AUTREY,[1] District Judge.
_____

MURPHY, Circuit Judge.

Gregory Hill and Pamela Kuenstler were each convicted of two charges related to manufacturing methamphetamine in an amount of fifty grams or more: one count of conspiracy to manufacture a mixture and substance of methamphetamine and another charging attempt to manufacture the same, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. Hill was also convicted of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The district court sentenced Hill to 360 months and Kuenstler to 63 months. Hill and Kuenstler appeal, and we affirm.

I.

In May 2001 authorities uncovered a methamphetamine lab in the attic of a house in which Hill and Kuenstler were staying. The lab contained equipment and precursor chemicals used to manufacture methamphetamine, as well as substances which contained methamphetamine (0.53 grams of solid material and 91.9 grams of liquid). Hill and Kuenstler were tied to manufacturing efforts at the lab by the testimony of Brenda Brown, the lessee of the house and a coconspirator. Brown was attempting to learn how to produce methamphetamine, and she testified that there had been several methamphetamine "cooks" at the lab. Hill and a friend of his had purchased the initial equipment to set up the lab and had supplied many of the precursor chemicals used in the cooks, such as pseudoephedrine, acetone, and muriatic acid. Hill had also helped with the manufacturing process by shaking solutions to break down ephedrine. Kuenstler had washed lab equipment in a manner

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri, sitting by designation.

2

designed to remove contaminants and had purchased tincture of iodine, another precursor chemical. Hill and Kuenstler had also helped Brown move the lab from a downstairs bedroom to the attic, and they each received a share of the methamphetamine produced.

Shortly before the lab was discovered, officers with an arrest warrant for Hill had arrested him in the vicinity of the house. On the front seat of his truck they found a small tin box which held a number of small plastic baggies, five of which contained a white powder substance later determined to be methamphetamine, and a small pink straw with powder residue in it. Elsewhere in the truck were a hypodermic needle, several other plastic baggies, and a sheet of paper with notations which appeared to be coded records of drug transactions.

A grand jury indicted Hill, Kuenstler, and Brown for conspiracy to manufacture and for attempt to manufacture a mixture and substance of methamphetamine in an amount of fifty grams or more. The indictment also charged Hill individually with possession of methamphetamine with intent to distribute; this count was based on the evidence found in his truck. Brown reached a plea agreement with the government, and Hill and Kuenstler proceeded to trial.

On the eve of trial Hill and Kuenstler moved to suppress evidence about the lab and its contents on the ground that it had been discovered by an unconstitutional search. The district court held an evidentiary hearing just before trial and denied the motion. In its oral ruling the district court found that although officers had entered Brown's residence without asking for consent, the defendants had no reasonable expectation of privacy in the attic because it was being used solely for commercial purposes.

The district court submitted the conspiracy and attempt charges to the jury with instructions that the defendants could not be convicted of either offense unless the

jurors found it "involved the manufacture of fifty grams or more of a mixture and substance of methamphetamine." Defendants objected and argued that the indictment and the statute required proof that the object of the conspiracy or attempt was to produce fifty or more grams of methamphetamine. The objection was overruled, and the government argued in closing that the quantity charged in the indictment had been established by evidence that the liquid substances in the lab weighed over ninety grams. Hill and Kuenstler were convicted on all counts. Hill had prior convictions, including one for selling methamphetamine, and was sentenced as a career offender to 360 months; Kuenstler had no prior record and was sentenced to 63 months. They appeal on several grounds.

## II.

Appellants claim that the district court erred by not suppressing the evidence found in the attic and by not requiring proof that the object of the conspiracy and attempt offenses was the production of fifty grams or more. They also contend that the liquid solutions in the lab were not mixtures or substances of methamphetamine within the meaning of the statute because they were unusable and unmarketable. Each raises individual claims as well. We address the arguments in turn.

Appellants claim first that their Fourth Amendment rights were violated by introduction of evidence connected with the methamphetamine lab because it resulted from an illegal search. The lab had been discovered after law enforcement officers, who had a felony arrest warrant for Hill, learned that he was staying with Brown. While waiting for a search warrant to be obtained, they proceeded to the vicinity of Brown's house in the hope of apprehending Hill if they saw him outside. When Hill came out of the house, they attempted to arrest him as he neared his pickup truck. He tried to get away, but two officers jumped into the back of the truck and it stalled after traveling a short distance. As Hill surrendered, a woman ran out of the house toward the officers, screaming "If you are going to kill him, you are going to have to kill me,

4

too." She too was placed under arrest, and officers observed that another woman was standing in the doorway of the house. They feared that they might be attacked by someone still in the house, and two of them went up to the door and asked whether anyone else was inside. Brown was the woman at the door, and she indicated that her friend Pamela Kuenstler was also there. The officers then went into the house and looked around to ensure that no one else presented a threat. One observed that a set of stairs had been lowered from the attic, and he went up and discovered the lab. An officer told Brown that they had seen the lab in the attic and would get a warrant if she did not want to consent to a search. Brown signed a consent form, and the contents of the lab were seized during the subsequent search.

After its evidentiary hearing, the district court found that Brown had not consented to the original search and concluded that the search had not been justified by exigent circumstances. It denied the motion to suppress evidence of the methamphetamine lab, however, because it concluded that neither Hill nor Kuenstler had a legitimate expectation of privacy in the attic and therefore no right to challenge the constitutionality of the searches. Hill and Kuenstler argue on their appeal that they were overnight guests who had a legitimate expectation of privacy in the entire house. The government responds that appellants forfeited any legitimate expectation of privacy in the house by using it for a commercial purpose, that Brown had consented to both searches, and that the first search was justified by exigent circumstances.

The Fourth Amendment protects "against unreasonable searches and seizures," but its protections are personal and cannot be asserted by persons lacking a "legitimate expectation of privacy" in the place searched. Rakas v. Illinois, 439 U.S. 128, 143 (1978). Such protection was extended to an overnight guest in Minnesota v. Olson because the visitor had a legitimate expectation of privacy in the home in which he was staying and thus the right to invoke the Fourth Amendment. 495 U.S. 91, 96–100 (1990). At the time of the search in this case both Hill and Kuenstler had

5

been staying with Brown, but the government argues that the overnight guest rule does not apply to them because they had been engaging in commercial activity in the house, citing Minnesota v. Carter, 525 U.S. 83, 90–91 (1998).

In Carter the Court distinguished an "overnight social guest" from someone "merely present with the consent of the householder" with no enforceable Fourth Amendment right in the premises. Id. at 90. Carter and another visitor who were packaging cocaine at an apartment were "essentially present for a business transaction." Id. They had no prior relationship with the lessee and were there only "to do business" with no showing of an "acceptance into the household." Id. The Court explained that an individual's expectation of privacy is less in property used "for commercial purposes," id., and the "purely commercial nature" of Carter's visit meant he did not have a legitimate expectation of privacy. Id. at 91. The search of the apartment therefore could not violate the Fourth Amendment in respect to the visitors. Id.

The Court's analysis in Carter demonstrates that whether an individual has a legitimate expectation of privacy depends upon an examination of all the facts related to the claimant's presence at the site of a search. See also United States v. Gamez–Orduno, 235 F.3d 453, 459–61 (9th Cir. 2000). Here there are facts which each side might draw on in their favor. Appellants had been staying with Brown for an extended period of time: Kuenstler for several months, Hill for several weeks. There was evidence that Kuenstler was a friend of Brown's[2] and that Hill was contributing to household costs while looking for another place to stay. A finder of fact might conclude that they were social guests accepted into the household. On the other hand, evidence connected Hill and Kuenstler to the methamphetamine lab on

---

[2]Brown testified that she had identified Kuenstler as her friend when officers came to the door (they claimed that she said nothing and only pointed to Kuenstler's presence).

6

the premises. There was evidence that Hill helped set it up by obtaining equipment, that both Hill and Kuenstler procured precursors and helped move the lab to the attic, and that both did work in the lab and received part of the methamphetamine produced. A finder of fact might conclude that distributable amounts of methamphetamine were produced in the lab and that Hill and Kuenstler were part of a commercial undertaking located in the house. Probably because the motion to suppress was filed so late, the district court did not develop the record in light of Carter or make findings of fact before it concluded that the defendants lacked a reasonable expectation of privacy. We are therefore not well positioned to rule on whether or not appellants had a reasonable expectation of privacy at Brown's house.

We turn instead to the validity of the search. Warrantless searches are presumptively unreasonable absent some exception to the warrant requirement. See United States v. Duchi, 906 F.2d 1278, 1282 (8th Cir. 1990). Officers discovered the lab in the attic after entering the house without a warrant. It is undisputed on appeal that they had obtained a valid consent from Brown before conducting a search of the lab, but appellants argue that the initial search of the house was illegal. The government responds that that search was justified because there were exigent circumstances facing the officers.[3]

Exigent circumstances exist where law enforcement officers have a "legitimate concern for the safety of themselves or others." United States v. Vance, 53 F.3d 220, 222 (8th Cir. 1995) (internal quotation marks omitted). The analysis of whether this exception to the warrant requirement has been made out is an objective one "focusing on what a reasonable, experienced police officer would believe." In re Sealed Case 96-3167, 153 F.3d 759, 766 (D.C. Cir. 1998) (internal quotation marks omitted); see also United States v. Clement, 854 F.2d 1116, 1119 (8th Cir. 1988). We review the

---

[3]The government contends in addition that Brown had also consented to the officers entering the house and looking around.

district court's findings of historical fact for clear error, but the ultimate determination of whether the facts as found constitute exigent circumstances is reviewed de novo. See Ornelas v. United States, 517 U.S. 690, 696 (1996); United States v. Cooper, 168 F.3d 336, 338–39 (8th Cir. 1999).

Applying the historical facts as found by the district court, we conclude that a reasonable officer would have been legitimately concerned for his safety and that of the other officers on the scene that day. The situation escalated quickly once the officers attempted to arrest Hill, and they did not approach Brown's house until after a number of worrisome events had occurred. First Hill resisted arrest, then a woman ran at them from out of the house screaming threats, and they next became aware that another person was watching them from inside the doorway of the house. They were also aware that there might be a drug lab inside the house.[4] A reasonable officer would have concluded in these circumstances that the officers faced a dangerous situation and that there could be other persons in the house who threatened their safety. See United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996); Vance, 53 F.3d at 222 (exigent circumstances existed after suspect exited house and surrendered, but another person was seen watching from door and there was reason to believe weapons were in house); see also United States v. Howard, 106 F.3d 70, 75 (5th Cir. 1997) (reasonable officer may fear presence of firearms in narcotics investigation because guns are tool of drug trade). Although, as the district court pointed out, the officers may have also been motivated by a desire to locate the lab or other suspects, an ulterior motive does not render a search illegal in a situation where officers have objectively reasonable safety concerns. Cf. Horton v. California, 496 U.S. 128, 138 (1990) ("The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is

---

[4]A member of the joint methamphetamine task force testified at the suppression hearing that the officers knew there was a "very high likelihood" that there was a methamphetamine lab in the house.

confined in an area and duration by the terms of a … valid exception to the warrant requirement.").

After examining the record, we conclude that the initial entry and search were justified by exigent circumstances and did not violate the Fourth Amendment. The district court therefore did not err by denying the motion to suppress. See Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1244 (8th Cir. 1995) (court of appeals may affirm on any ground supported by record).

Appellants argue that they should not have been held accountable for fifty or more grams of methamphetamine. They point to language in 21 U.S.C. § 841(b)(1)(B), which sets minimum and maximum penalties for any "violation … *involving*— … 50 grams or more of … methamphetamine." (emphasis added). Appellants argue that a conspiracy can only involve fifty grams or more if there is an agreement to make that amount (and that an attempt can only involve fifty grams or more if the defendants actually try to make that amount). They contend that the jury instructions should have required such findings. The government responds that their argument is contrary to the plain language of the statute and that the jury was correctly instructed on the elements of conspiracy and attempt.

The district court instructed the jury that, in order to convict the defendants of conspiracy or attempt, it must find that "the violation of the law involved the manufacture of 50 grams or more of a mixture and substance of methamphetamine." The instructions followed the plain language of the statute, see United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997) (unambiguous plain language controls absent legislative intent to the contrary), and they are in accord with the common practice of proving drug quantity by evidence of actual quantities seized. See, e.g., United States v. Valensia, 299 F.3d 1068, 1076 (9th Cir. 2002). Appellants' attempt to read additional requirements into the statutory offenses is not persuasive.

Appellants also claim that the jury instructions modified an essential element of the offense charged and thus constructively amended the indictment. See United States v. Johnson, 934 F.2d 936, 941 (8th Cir. 1991). The indictment alleged the essential elements for conspiracy and attempt, but it also alleged that the object of these offenses was the production of fifty or more grams of methamphetamine. This factual allegation did not add another element to the crimes charged, however. "When an indictment includes all of the essential elements of an offense, but also treats other, superfluous matters, the superfluous allegations may be disregarded." United States v. Wells, 127 F.3d 739, 743 (8th Cir. 1997) (allegation in indictment that misstatements were material was not required in jury instructions where materiality was not an element of crime). There was no constructive amendment of the indictment here.

Appellants also contend that the § 841(b)(1)(B) phrase "mixture or substance containing a detectable amount of methamphetamine" only applies to usable or marketable mixtures or substances. They point out that the government's expert testified that only 0.53 grams of the mixtures found in the lab were usable methamphetamine and that 91.9 grams were unusable toxic liquid solutions of a type that could represent waste product. Some courts have concluded that only usable or marketable mixtures were intended by Congress to satisfy the statutory amount. See United States v. Richards, 87 F.3d 1152, 1154–55 (10th Cir. 1996) (noting conflicting lines of cases and holding that "mixture or substance" must be given its plain meaning). In developing their position on drug mixtures, these courts have drawn on language used by the Supreme Court in Chapman v. United States, 500 U.S. 453, 461–62 (1991). Chapman involved a question of how drug quantity should be determined when LSD is combined with blotter paper. The Supreme Court held that the combination is a "mixture" under § 841(b), relying both on the plain meaning of the phrase "mixture or substance" and on congressional intent. It characterized the legislative intent as a "market-oriented approach to punishing drug trafficking, under

10

which the total quantity of what is distributed … is used to determine the length of the sentence." Id.

Both Chapman rationales support the conclusion that the solutions in this case fall within the scope of §841(b)(1)(B). First, undisputed expert testimony established that the liquid solutions here were mixtures containing methamphetamine under the plain meaning of that term. Second, a "market-oriented" analysis supports the finding that the liquid solutions in the lab were mixtures or substances containing methamphetamine. The market for this type of methamphetamine is based on its manufacture in labs like that of the conspirators, and that process involves creation of liquid solutions like those seized here, a process that results in a product for distribution. See United States v. Palacios-Molina, 7 F.3d 49, 53 (5th Cir. 1993); United States v. Robins, 967 F.2d 1387, 1390 (9th Cir. 1992). The evidence introduced by the government was sufficient to establish the quantity alleged in the indictment for the attempt and conspiracy offenses.

Hill raises two individual claims on appeal, the first of which is that the district court erred by allowing opinion testimony from four government witnesses who had not been disclosed as experts. These witnesses testified that certain evidence was consistent with the normal practice of drug dealers, and Hill asserts that this testimony should only have been permitted from designated experts. To establish a right to reversal, Hill would have to show both that a discovery rule was violated and that the violation was prejudicial. See United States v. Longie, 984 F.2d 955, 958 (8th Cir. 1993). Hill has not shown prejudice. Although he says he had insufficient time to prepare a response to the testimony, he neither requested a continuance nor stated how he would have rebutted the evidence if the witnesses had been disclosed as experts. Moreover, there is no question that the witnesses were qualified to give expert opinions—the record reflects that each had extensive background in law enforcement, including experience investigating the methamphetamine business in Kansas City. Hill has failed to show he is entitled to a reversal. See United States v.

11

Johnson, 228 F.3d 920, 925–26 (8th Cir. 2000); United States v. Ortega, 150 F.3d 937, 943–44 (8th Cir. 1998).

Hill also appeals the denial of his motion for judgment of acquittal on the charge of possession with intent to distribute, arguing that the 0.47 grams of methamphetamine found in his truck was not a sufficient amount to establish intent to distribute. There was adequate circumstantial evidence to support the jury's conclusion, however. The methamphetamine was divided into five individual packages, found with other packaging material and a sheet of drug notes, and Brown testified that Hill regularly sold methamphetamine to a number of customers. See United States v. Barrow, 287 F.3d 733, 736–37 (8th Cir. 2002). (presence of packaging material can support inference of intent to distribute); United States v. Temple, 890 F.2d 1043, 1045 (8th Cir. 1989). The district court properly denied Hill's motion for acquittal on Count III.

Kuenstler also raises two individual claims on appeal. First, she argues that the district court did not adequately instruct the jury on Brown's credibility in light of her cooperation agreement. The court's instruction informed the jury that Brown had reached an agreement with the government and that the jury was responsible for determining her credibility. The district court did not abuse its discretion by refusing to give a more specific instruction. See United States v. Kouba, 822 F.2d 768, 771 (8th Cir. 1987). Kuenstler also appeals from the denial of her motion to sever. She says she was prejudiced by a joint trial because the jury was exposed to evidence about Hill's criminal record, his greater involvement in the charged offenses, his participation in a separate scheme to manufacture methamphetamine, and a threat he made to Brown about her cooperation. The general rule is that coconspirators should be tried together, however, see United States v. Robinson, 774 F.2d 261, 265 (8th Cir. 1985), and a severance should not be granted if "less drastic measures, such as limiting instructions … will suffice to cure any risk of prejudice." Zafiro v. United States, 506 U.S. 534, 539 (1993). Kuenstler has not shown that the court's limiting

instructions were insufficient, and we conclude that the district court did not abuse its discretion by denying her motion to sever. See United States v. Robinson, 774 F.2d 261, 267 (8th Cir. 1985).

## III.

In sum, we conclude that exigent circumstances justified the entry into Brown's house and that the Fourth Amendment was not violated by the seizure of evidence found there; that appellants' arguments based on the methamphetamine statute, the indictment, and the jury instructions are without merit; and that the district court neither abused its discretion in its evidentiary rulings or jury instructions nor erred in ruling on motions for acquittal or severance. The judgments are therefore affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.