**UNITED STATES of America,
Plaintiff,**

v.

**Chardae Latrese Cynthia THOMPSON,
Defendant.**

**No. C4–04–086.**

United States District Court,
D. North Dakota,
Northwestern Division.

March 21, 2005.

creational use statute under Chapter 53–08 of the North Dakota Century Code.

Kent Rockstad, U.S. Attorney's Office, Fargo, ND, for Plaintiff.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

HOVLAND, Chief Judge.

Before the Court is the Defendant's Motion to Suppress filed on February 24, 2005. The Government opposes the motion. For the following reasons, the motion is denied.

## I. BACKGROUND

On July 17, 2004, a one-way Amtrak ticket was purchased for the defendant, Chardae Thompson, with $570 in cash.[1]

The train was traveling from Seattle, Washington to Chicago, Illinois. Thompson boarded the train in Seattle on July 19, 2004. *See* Marchus Investigation Report, p. 1.

On July 20, 2004, Task Force Officer Chuck Panzer of the Ward County Narcotics Task Force was contacted by Detective Charles George of the Amtrak Police Department in Washington, D.C. Detective George requested assistance by asking Officer Panzer to conduct an interdiction on Thompson when the train made its scheduled stop in Minot, North Dakota. Officer Panzer contacted an Amtrak official and confirmed that Thompson was on board. She was to be located in bed number two of sleeper car eight-hundred and thirty (830). The train was scheduled to arrive in Minot at 9:22 p.m. *See* Marchus Investigation Report, p. 2.

Officer Panzer enlisted the assistance of other members of the Task Force, including Special Agent Mike Marchus of the North Dakota Bureau of Criminal Investigation, Officer Travis Anderson, and Brian Novelesky, a special agent of United States Immigration and Customs Enforcement. The train arrived in Minot at approximately 10:00 p.m. Once on board, Agents Marchus and Novelsky located Thompson in the observation deck of the lounge car. Affidavit of Chardae Thompson, ¶3. Agent Marchus asked Thompson if she was Chardae Thompson and she replied by correcting the pronunciation of her name. Agent Marchus identified himself and asked Thompson for identification. Thompson informed Agent Marchus that her identification was in her sleeper car and she escorted Agents Marchus and Novelsky to sleeper car 830. *See* Marchus Investigation Report, p. 2.

[1] Thompson maintains that the ticket was paid for by her uncle.

The parties disagree as to what happened next. Thompson maintains that Agent Marchus entered her sleeping car uninvited and opened the closet. Affidavit of Chardae Thompson, ¶ 3. No such information is reflected in the police reports. However, it is undisputed that Thompson eventually retrieved her identification and presented it to Agent Marchus. At which time, Agent Marchus informed Thompson that he was conducting a drug interdiction and that he had information that she may be transporting illegal drugs. When asked if she had any illegal drugs, Thompson responded "no." After which, Agent Marchus asked if he could conduct a search. Investigation Report, p. 2. The exact wording of Agent Marchus' request is in dispute. Thompson contends that Agent Marchus merely asked whether he "could search the bag on the bunk." Affidavit of Chardae Thompson, ¶ 4. The Government contends that Agent Marchus asked for permission to search the sleeper car or sleeper area. Marchus Investigation Report, pp. 2–3; Panzer Investigation Report, p. 2. In either case, the parties agree that consent was given.

Thompson contends that the search began with a bag on the bunk, then proceeded to her purse. Affidavit of Chadae Thompson, ¶ 4. Thompson purportedly objected to the search of her purse. *Id.* Neither search appears in the police reports. At some point, Agent Marchus noticed a blue colored Atlantic suitcase with an expandable handle and wheels on the top bunk of Thompson's sleeper area. Agent Marchus pulled the suitcase down from the top bunk and placed in on the floor in the hallway outside Thompson's room. The suitcase was padlocked on the zipper to the main compartment of the suitcase. Panzer Investigation Report, at 2. According to Agents Marchus and SA Panzer, they detected a strong smell of dryer sheets emanating from the suitcase. Based on training and experience, the agents were aware of the fact that dryer sheets are often used to mask the odor of drugs. Marchus Investigation Report, p. 3; Panzer Investigation Report, p. 2. When asked about the suitcase, Thompson denied ownership, but did admit to bringing it on the train. She also stated that the agents could not search the suitcase because it belonged to her aunt and she had no key for the padlock. Agent Marchus described Thompson as acting "very nervous" when being questioned about the suitcase, although Thompson denies that allegation. Marchus Investigation Report, p. 3; Affidavit of Chardae Thompson, ¶ 4–5. The blue suitcase, along with three other suitcases, were placed in the hallway outside Thompson's room.

Agent Marchus requested the assistance of a drug detection dog. Upon arriving, the dog, "Sierra," alerted on the blue suitcase. Agent Marchus contacted Assistant State's Attorney Kelly Dillon to inform her of what had taken place. Dillon informed Agent Marchus that there was enough probable cause to detain Thompson and the suitcase, as well as apply for a search warrant. Both Thompson and the blue suitcase were then transported to the Minot Police Department. *See* Marchus Investigation Report, pp. 3–4.

On July 21, 2004, at 12:15 a.m. State District Court Judge Douglas L. Mattson signed a search warrant for the blue suitcase. The suitcase was subsequently opened revealing seven (7) vacuum-sealed clear bags each containing approximately one (1) pound of marijuana, and one thousand two hundred and ninety-three (1,293) ecstasy pills. At approximately 12:47 a.m. Thompson was arrested and given her Miranda warnings. She stated that she understood her rights and requested an attorney. *See* Marchus Investigation Report, p. 4.

On November 3, 2004, Thompson was indicted on two counts of Possession With Intent to Distribute a Controlled Substance. *See* Docket No. 1. Thompson entered a plea of not guilty to both counts on November 30, 2004, before Magistrate Judge Charles S. Miller, Jr. *See* Docket No. 8. On February 23, 2005, Thompson filed the present motion seeking to suppress the fruits of the search on July 21, 2004.

## II. *LEGAL DISCUSSION*

"The Fourth Amendment protects 'against unreasonable searches and seizures,' but its protections are personal and cannot be asserted by persons lacking a 'legitimate expectation of privacy' in the place searched." *United States v. Kuenstler*, 325 F.3d 1015, 1020 (8th Cir.2003) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). An individual asserting Fourth Amendment rights "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir.1994).

■ It is well-established that the Fourth Amendment rights are personal and may not be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Morales*, 737 F.2d 761, 763 (8th Cir. 1984). If a defendant fails to prove a close connection to the relevant places or objects searched, she has no standing to claim the search was illegal. Further, the defendant moving to suppress certain evidence has the burden of proving a reasonable expectation of privacy in the area searched.

*Rakas*, 439 U.S. 128, 130–131, 99 S.Ct. 421, 58 L.Ed.2d 387. There are a number of factors that are relevant to the determination of standing. Those factors include ownership; possession or control of the area searched or items seized; historical use of the property or item; ability to regulate access; the existence or non-existence of a subjective anticipation of privacy; the objective reasonableness of the expectation of privacy considering the specific facts of the case; and the totality of the circumstances surrounding the search. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir.1994) (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir.1991)).

■ Further, "[w]hen a person voluntarily abandons property, he or she forfeits any expectation of privacy that he or she might otherwise have had in it." *United States v. Washington*, 146 F.3d 536, 537 (8th Cir.1998) (citations omitted). "Whether an abandonment has occurred is determined on the basis of objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir.1997). "When considering whether the circumstances support a finding of abandonment, 'two important factors are denial of ownership and physical relinquishment of the property.'" *United States v. Landry*, 154 F.3d 897, 899 (8th Cir.1998) (quoting *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir.1986)).

■ The Eighth Circuit has consistently upheld searches when a defendant disclaims an interest in the property being searched, either for lack of standing, or under the principle of abandonment, or both. *See United States v. Washington*, 197 F.3d 1214, 1216 (8th Cir.1999) ("Since [the Defendant] has consistently disavowed any ownership interest in the bag containing cocaine, he is precluded from claiming that the bag was searched and its contents

seized in violation of his constitutional rights."); *United States v. Sanders*, 130 F.3d 1316, 1317–18 (8th Cir.1997) ("[The Defendant's] statements to the officers that he did not own the bag were sufficient to constitute abandonment" even if the officers knew he was lying. "The Fourth Amendment only protects privacy. It does not immunize people who, finding themselves in a compromising situation, voluntarily trade their interest in privacy for a chance to escape incrimination, no matter how unwise the decision may seem in retrospect."); *United States v. Porter*, 107 F.3d 582, 584 (8th Cir.1997) ("By denying ownership of the bag and telling [the officer] to search the bag, [the Defendant] abandoned it. Furthermore, [the Defendant's] contention that the bag could have belonged to a third party and that the cocaine evidence should therefore be suppressed is without merit because fourth amendment rights are personal and cannot be enforced vicariously."); *United States v. Thompkins*, 998 F.2d 629, 631–33 (8th Cir.1993) (upholding a search of a suitcase when the Defendant denied ownership and did not object to the suitcase being searched); *United States v. Ruiz*, 935 F.2d 982, 983–85 (8th Cir.1991) (upholding a search of luggage where the defendant denied ownership, even if the officers knew he was lying); *United States v. Duong*, 336 F.Supp.2d 967 (D.N.D.2004) (adhering to the well-established Eighth Circuit precedent regarding both standing and abandonment for purposes of the Fourth Amendment).

In the present case, it is clear and undisputed that defendant Chardae Thompson has consistently denied ownership in the blue suitcase. She consistently maintained that the suitcase belonged to her aunt. *See* Affidavit of Chardae Thompson, ¶ 4 ("I told them that was not my bag and they could not search it."); Defendant's Motion to Suppress, p. 3 ("[S]he stated that it was her aunt's and that police could not search

it."); Marchus Investigation Report, p. 3 ("Thompson denied that the suitcase was hers.... Thompson stated that she brought a suitcase with her on the train, but the suitcase belonged to her aunt."); Panzer Investigation Report, p. 2–3 (same). The Eighth Circuit precedent is clear. When Thompson disclaimed ownership in the blue suitcase she surrendered any legitimate expectation of privacy she had in the bag. Thompson may not vicariously assert the protections of the Fourth Amendment on behalf of her aunt, because she lacks standing to do so. The Court concludes that Thompson had no expectation of privacy in the suitcase and no standing to challenge the constitutionality of the officer's search. It is clear that Thompson's statements to the officers that she did not own the blue suitcase were sufficient to constitute abandonment and support a lack of standing.

### III. CONCLUSION

For the reasons outlined above, the Defendant's Motion to Suppress is **DENIED** (Docket No. 18).

**IT IS SO ORDERED.**