# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3648

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United |
| v. | * | States District Court for |
| | * | the District of Nebraska. |
| Carlos Ramirez, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 15, 2011
Filed: April 26, 2012

_____

Before RILEY, Chief Judge, BEAM, and BYE, Circuit Judges.

_____

BEAM, Circuit Judge.

Carlos Ramirez appeals from the district court's denial of his motion to suppress evidence obtained during a hotel room raid by officers in Omaha, Nebraska, in June 2009. Because we conclude that there were no exigent circumstances sufficient to justify the warrantless entry, we reverse.

## I.    BACKGROUND

On June 29, 2009, officers conducting surveillance at the Greyhound bus terminal in Omaha arrested Juan Perez and Juan Amaya-Armenta carrying heroin in

their shoes. Perez informed officers that he was traveling with a third male wearing a dark shirt with a white logo, who also had heroin in his shoes. Following the arrests, the officers tried to uncover additional evidence to locate this third man and identified and removed several bags from under the bus. They then attempted to locate the owners of the retrieved bags by approaching the bus passengers, but nobody claimed ownership. A search of the abandoned bags uncovered an identification card belonging to Hector Cruz. The investigators spoke to the bus driver who reported that he was missing five passengers, two of whom the officers determined were the already-arrested men. The officers were then able to obtain the ticket information for the remaining three, identifying Luis Ibarra-Penuelas, Hector Cruz, and Ramirez.

From the ticket information, officers learned that Ramirez and Ibarra-Penuelas were traveling from San Diego to Newark, on cash, one-way tickets, purchased in much the same fashion Perez and Amaya-Armenta–who also were traveling on cash, one-way tickets, purchased about the same time or within minutes of each other. Cruz traveled in a similar fashion on a nearly identical route with a ticket purchased with cash, and accompanied Ramirez and Ibarra-Penuelas.

A bit of a goose chase ensued. Through combined efforts, after an officer contacted local cab companies to see if there was a recent pickup from the bus station, the officers went to a nearby Best Western hotel to determine if the men possibly went there. There, the officers learned that three individuals arrived at the Best Western in a cab but did not stay. After questioning employees of the Best Western, officers learned that one of those individuals matched the description of the traveling companion provided by Perez and another matched the photo of Cruz retrieved from the abandoned bag. Further investigation revealed that the men had then taken a cab to the Comfort Inn. At the Comfort Inn, video surveillance revealed that three individuals, one of whom matched the description given by Perez, and another that matched Cruz's identification card, exited a cab in front of the hotel but did not enter

the hotel. Instead, they walked to a nearby McDonald's and officers noticed from the video that two of them walked "heavily-footed," or not normal. At the McDonald's, the officers learned from an employee that she had provided three individuals with a phone book and noted that the men were looking for a cab. The officers contacted various local cab companies again and were told three individuals were picked up from the McDonald's area and taken to the Econo Lodge.

At the Econo Lodge, an officer learned from the desk clerk that three men checked in about a half hour earlier and that one of the men looked like the person on Cruz's identification card. The clerk told the police that these men were in room 220 and gave the officers a key card to the room, as well as a copy of the receipt showing the room was rented to Cruz. Officers then went to room 220; in all, six officers responded at the Econo Lodge, at least one of whom established perimeter surveillance. An officer close to the door testified that the only sound he heard from the room was, after he ultimately knocked on the door, the sound of an individual approaching the door. There is no evidence that the men inside room 220 even knew the police were on their trail.

Once at room 220, an officer attempted to swipe the key card to gain entry into the room but the card did not work. At that point, the officer blocked the peephole, knocked on the door, and announced "housekeeping." Cruz partially opened the door and when the officer announced his presence and flashed his badge, Cruz attempted to push the door shut. The officers used a ram, which they had brought along apparently anticipating a forced entry, to force the door open. The officers found Ramirez, Ibarra-Penuelas, and Cruz inside. After conducting a cursory sweep and securing the three men, an investigator noticed two pairs of shoes on the side of the bed similar to those packed with heroin and worn by Perez and Amaya-Armenta. Ramirez and Ibarra-Penuelas denied that these shoes belonged to them, and Cruz claimed a pair of boots located elsewhere in the room as his. After the men denied ownership of the two pair of shoes by the bed, the investigators searched the shoes

for contraband and found heroin in each. The entire course of events from the time officers approached Perez and Amaya-Armenta at the bus station, and the officers' arrival at the Econo Lodge was approximately two and a half hours.

Before the district court, Ramirez argued that the search of the hotel room was illegal and conducted without a search warrant. The magistrate judge recommended, and the district court found, that the officers' entry was justified by an exigent circumstance: the officers' reasonable fear that the evidence would be imminently destroyed. The magistrate judge's analysis (also adopted by the district court) focused on the following facts known to the police prior to the entry: 1) one of the investigators reasonably believed the men were attempting to elude the officers after they witnessed the officers arrest the two men at the bus stop; 2) the men in room 220 had purchased one-way tickets to Newark, New Jersey, with cash, and were not from Omaha; and 3) after the officers announced their presence, Cruz attempted to shut the door to prevent the officers from entering the room. Once inside, because the men did not claim ownership of the shoes, the court determined they were abandoned and thus the men had no expectation of privacy in them. Accordingly, the court denied Ramirez's motion to suppress.

## II.   DISCUSSION

On appeal Ramirez argues that the district court erred in finding exigent circumstances justified the officers' warrantless entry into the hotel room. He claims that any alleged "exigency," if it existed at all on these facts, existed only because the officers created it–that the warrantless, unconstitutional search occurred when the officer unsuccessfully swiped the room card and only then did the officers knock, ultimately resulting in them breaking down the door to enter. Ramirez argues that there are no facts supporting the officers' failure to obtain a warrant in this case.

## A.    Standard

"The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." United States v. Williams, 521 F.3d 902, 905 (8th Cir. 2008).

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The text of the Amendment itself expressly imposes two requirements. "First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." Kentucky v. King, 131 S. Ct. 1849, 1856 (2011). "'[T]he ultimate touchstone of the Fourth Amendment is "reasonableness."'" Id. (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). So, even though a warrant must generally be secured, see id., a non-consensual, warrantless search can be justified by reasonable exceptions, including exigent circumstances. Williams, 521 F.3d at 908. "The [exigent circumstances] exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996).

"We review the district court's findings of historical fact for clear error, but the ultimate determination of whether the facts as found constitute exigent circumstances is reviewed de novo." United States v. Kuenstler, 325 F.3d 1015, 1021 (8th Cir. 2003). "The analysis of whether [the exigent circumstance] exception to the warrant

-5-

requirement has been made out is an objective one 'focusing on what a reasonable, experienced police officer would believe.'" Id. at 1021 (quoting In re Sealed Case 96-3167, 153 F.3d 759, 766 (D.C. Cir. 1998)). "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984). When the exigency at issue is destruction of evidence, police officers must demonstrate a sufficient basis for an officer to believe that somebody in the residence (or hotel room, in this case) will imminently destroy evidence. United States v. Clement, 854 F.2d 1116, 1119 (8th Cir. 1988).

## B.    Exigent Circumstances

The government claims that at the moment the officers were outside of room 220, exigent circumstances justified this warrantless entry because the officers believed, even before they swiped the key card, that the risk of destruction of evidence was imminent. By the time the officers arrived at the hotel, they had gathered additional, minimal information about the three men traveling from place to place who ultimately checked into room 220: Ramirez, a man who fit the description of the companion offered by Perez, was traveling with two others on similar cross-country routes on tickets purchased in cash, and two of them were walking "heavily-footed," indicating they may also be carrying heroin in their shoes. Yet, the government fails to meet its heavy burden to connect this knowledge with the existence of exigent circumstances supporting the warrantless entry–that is, that the inhabitants of room 220 would imminently destroy evidence.

Alan Eberle, an investigator with the Nebraska State Patrol, testified at the suppression hearing that based on the hotel-hopping actions of these men after, Eberle

supposed, the three observed the arrests at the bus station,[1] he was concerned that they were trying to elude officers or were going to destroy evidence or personal items linking them to the case. Exigency, however, does not exist by mere supposition. Stating a belief that these men were about to destroy evidence after safely arriving at the Econo Lodge and checking into their room, seemingly without knowledge that they were being tracked by law enforcement, is quite speculative. And, as noted, Investigator Eberle's subjective belief is not determinative in our analysis. "[T]his court must look objectively at what a reasonable police officer would believe[,]" given the objective facts at the officer's disposal at the time of entry. Williams, 521 F.3d at 908.

The Supreme Court's very recent opinion in King is a logical starting point in our analysis. King, 131 S. Ct. 1849. While instructive on the issue of exigency, however, King is not dispositive of the issues before us because in King, the Court assumed the existence of exigent circumstances so as to focus on the issue presented.[2]

_____

[1]That the three men observed the arrests at the bus station is an assumption by Investigator Eberle. Eberle assumed that the reason these three men left the bus station was because they observed the arrest of the other two but there is no record evidence in support of this assumption. In fact, there is no evidence regarding whether the three men left the station before or after the officers' contact with Perez and Amaya-Armenta. The officers only knew that Perez indicated he was traveling with a man later determined to resemble Ramirez. While Investigator Eberle's subjective assumption may be fair, there is insufficient objective evidence to support his presumption.

[2]The Court was careful to note that it did *not* make any determination as to whether exigent circumstances existed in King. The Kentucky Court of Appeals found that there was a real exigency but the Kentucky Supreme Court expressed doubt, "observing that there was 'certainly some question as to whether the sound of persons moving [inside the apartment] was sufficient to establish that evidence was being destroyed." King, 131 S. Ct. at 1862 (alteration in original) (quoting King v. Commonwealth, 302 S.W.3d 649, 655 (Ky. 2010)). The Court did not weigh in on

There, the Court focused solely on articulating under what circumstances police impermissibly create an exigency.[3] Id. at 1862-63. In doing so, the Court reviewed whether the exigent circumstances exception applies when police, by knocking on a door of a residence and announcing their presence, cause the occupants to attempt to destroy evidence–a most basic scenario of the "police-created exigency" doctrine. Id. at 1854. The Court held that any exigency that existed was not police-created and that the warrantless entry and search was justified. Id. at 1863.

King's discussion of reasonable police conduct informs our analysis on the issue whether a genuine exigency, in fact, supported the warrantless entry in the instant case. Relevant here, the officers in King arrived at a door from which they smelled marijuana smoke and the officers banged on the door as loud as they could and announced their presence, saying "Police, police, police," or something to that effect. Id. at 1854. An officer testified that as soon as they started banging on the door, they could hear people inside moving and it sounded as though things were being moved, leading the officers to believe that drug-related evidence was about to be destroyed. Id. Accordingly, the officers announced that they were going to make entry and then kicked the door down, ultimately leading to the discovery of the evidence at issue. Id.

---

the matter and arrived at its conclusion, "assum[ing] for purposes of argument that an exigency existed." Id. at 1862.

[3]Many courts, including the Eighth Circuit, have developed an exception to the exigent circumstances rule, the so-called "police-created exigency" doctrine. "Under this doctrine, police may not rely on the need to prevent destruction of evidence when that exigency was 'created' or 'manufactured' by the conduct of the police." King, 131 S. Ct. at 1857 (discussing the various "police-created exigency" exception tests developed by the lower courts and establishing that, despite the many unsound requirements imposed by the lower courts, the essential predicate to any valid warrantless seizure of incriminating evidence is that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence was seized).

The Court held that the officers' conduct in King was entirely consistent with the Fourth Amendment and in doing so, likewise discussed the privacy rights of occupants who have no obligation whatsoever to respond. Id. at 1862. No matter that the officers in King banged on the door and loudly announced their presence, the Court held that "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether [the person at the door is an officer or a private person], the occupant has no obligation to open the door or to speak." Id. The occupant, now alerted to the police presence, may even choose to open the door and speak but need not allow the officers to enter and may refuse to answer questions at any time. Id. But, cautioned the Court, if the occupants choose not to stand on their constitutional rights and "instead elect to attempt to destroy evidence," they "have only themselves to blame for the warrantless exigent-circumstances search that may ensue." Id.

One of the three facts relied upon by the district court in its analysis of the exigency supporting this warrantless entry was Cruz's attempt to shut the door once he became aware of the police presence outside room 220. This, however, occurred after the officers unsuccessfully attempted to unconstitutionally enter room 220 with the key card, which they admit compromised their position outside the hotel room that morning.[4] As a result of that failure, the officers blocked the peephole, knocked on the door, and announced "housekeeping." Even were we to wholly ignore the failed unconstitutional entry that set the stage, so-to-speak, and prompted (according to the

---

[4]As discussed herein, there is no justification on these facts for the officers' attempt to enter room 220 without a warrant by way of swiping the key card. The officers had no warrant and there were no exigent circumstances supporting this entry, had the officers succeeded. See Williams, 521 F.3d at 907-09 (discussing the unconstitutional acts of an officer that began to kick on a hotel room door and attempt entry after the occupant slammed the door shut and engaged the dead bolt in response to the officers' knocks, thus unequivocally invalidating the existence of any alleged consent to search).

-9-

officers) this knock and announce, and we make no determination regarding whether any alleged exigency at that point was police-created, Cruz's attempt to shut the door in response to the knock does not support the exigency here.

Made plain in <u>King</u>, officers certainly have the option at all times to merely knock on a door and seek entry. Indeed, <u>King</u> holds that officers might even reasonably pound on a door and announce their presence without running afoul of the police-created exigency rule. <u>Id.</u> at 1861. When they do so, "they do no more than any private citizen might do." <u>Id.</u> at 1862. However, when the police knock on a door but the occupants choose not to respond or speak, or maybe even choose to open the door and then close it, or when no one does anything incriminating, the officers must bear the consequences of the method of investigation they've chosen. At that point, if their method fails, "'the investigation will have reached a conspicuously low point,' and the occupants 'will have the kind of warning that even the most elaborate security system cannot provide.'" <u>Id.</u> (quoting <u>United States v. Chambers</u>, 395 F.3d 563, 577 (6th Cir. 2005) (Sutton, J., dissenting)). Accordingly, crediting these officers with conducting a run-of-the-mill attempt to simply knock and gain entry, Cruz was under no obligation to allow the officers to enter the premises at that point and was likewise within his bounds in his attempt to close the door. That he did so, without more, does not bolster the claim that it was reasonable to conclude that the destruction of evidence was imminent.[5]

---

[5]Investigator Eberle testified that the door partially came open and then after an officer presented his badge and announced, "Police," "the door was being pushed shut." If Cruz's reaction had been the verbal, visual, or aural equivalent of, "The police are here, destroy the drugs," our analysis may be different. <u>See</u> <u>United States v. Chambers</u>, 395 F.3d 563, 577 (6th Cir. 2005) (Sutton, J., dissenting) (discussing a situation where a woman came to a glass door to answer an officer's knock, immediately retreated, calling out that there were police at the door, which prompted sounds of scurrying inside the abode). We do not surmise as to what compilation of facts might suffice to establish exigency when police are at a door; we only note that it is not out of the realm of possibilities that a resident's reaction to the knock and

Looking then at the remaining two bases for the district court's analysis, the circumstances relied upon by the district court are not exigent. "The urgency that would justify allowing the police officers, rather than a neutral judicial officer, to draw the reasonable inferences supporting this entry is not present in these facts." United States v. Duchi, 906 F.2d 1278, 1282 (8th Cir. 1990). At the time these officers attempted to enter room 220, they reasonably believed that two of the occupants of room 220 possessed heroin in their shoes, and the officers believed that the men had, possibly, attempted to elude the police either to flee themselves, which seems more tenable, or, more tenuously, to destroy the evidence at some point.[6] That the officers tracked the men also does not impact our analysis. There is no evidence supporting the inference that these men knew the police were tracking them at all, which might lend credence to that line of reasoning as it relates to the imminent destruction of evidence. Also, knowledge that drugs were in the room does not suffice to conclude that destruction was imminent.

Prior to using the key card, the officers heard no sounds at all in room 220–no dead bolt lock being engaged, no toilet flushing or a shower or faucet running, and no shuffling noises or verbal threats emanating from the room; nor did the officers have any information that an occupant of room 220 had attempted to escape through a window, nor any indication that these individuals were armed or dangerous. In fact, the officer closest to the door heard only the sound of someone approaching after he had knocked. Accordingly, at the time these officers sought to gain entry by swiping the key card, they had no indication whatsoever that there was any activity at all in

announce method might indeed inform the exigent circumstance analysis.

[6]That the men had in no way attempted to destroy the evidence during the two hours or so en route to the Econo Lodge lends itself more reasonably to the conclusion that these men were attempting to flee themselves (a basis for exigency not relied upon by the government on appeal) or that they were attempting to relocate–not destroy–the heroin in their possession.

-11-

the hotel room, let alone any activity that might lead them to believe that the occupants inside might imminently destroy evidence. Especially given the fact that the occupants/suspects checked in thirty minutes prior, and there was nothing to lead the officers to believe that they had since left, the silence in the room nearly solidifies the inference that *nothing* was going on in room 220. But see United States v. Granados, 596 F.3d 970, 973-74 (8th Cir. 2010) (upholding warrantless entry into a hotel room when officers were aware occupant of room accompanied a known drug supplier that had just been arrested in the parking lot, officers reasonably believed weapons were in the room and that the occupant had been surveilling the parking lot activity, officers smelled marijuana in the hallway just outside the room, and they were concerned for the safety of an informant's family); United States v. Leveringston, 397 F.3d 1112, 1116 (8th Cir. 2005) (warrantless entry to hotel room justified by risk that evidence would be destroyed when hotel management complained of suspicious drug activity in the room, occupant opened curtains and saw police and then officers heard sounds of pots and pans slamming, dishes breaking, water flowing, and garbage disposal grinding); United States v. Marin-Cifuentes, 866 F.2d 988, 991-92 (8th Cir. 1989) (exigent circumstances supported warrantless search given police surveillance of meetings between dealers prior to drug delivery, identification of a "load" vehicle, surveillance of phone calls to hotel room occupant from known drug dealers, and the arrest of two cohorts, which would likely tip off the hotel occupant who was known to be "surveillance conscious").

On appeal, the government almost wholly relies on a line of cases involving situations where this court has found exigency based upon facts where the failure of one party's return might tip off an occupant that a deal had gone "sour" or law enforcement was involved, thus prompting the imminent destruction of evidence. For example, the government cites United States v. Kulcsar, 586 F.2d 1283 (8th Cir. 1978), where officers arrived at a known drug supplier's home after arresting a drug dealer en route to the home, and saw a man fitting the description of the supplier look out of a second floor window and then quickly move out of view. Id. at 1285.

Accordingly, the officers believed the supplier was inside and knew of their presence, and thus entered the home without a warrant and arrested him. Id. This court condoned the entry, noting that if the officers waited the several hours the record indicated it would have taken to obtain a warrant, the drug courier arrested en route to that supplier's house would not have returned, and the supplier would have been on notice that something was up, which would have likely precipitated the removal or destruction of the narcotics therein. Id. at 1287. The government offers no facts of the sort in this case.

In each of the other cases cited by the government, facts in the record supported the theory of exigency advanced by the government. In each instance, the arrest of a single suspect outside of the location searched likely would have alerted a second suspect, who had the evidence and was within the location at issue, that something was awry. In each case, it was thus reasonable for the officers to conclude that discovery of pursuit was imminent, resulting in destruction of evidence. United States v. Wentz, 686 F.2d 653 (8th Cir. 1982) (condoning a warrantless entry into a home where a prior drug transaction occurred because the occupants would grow suspicious when one of the dealers failed to return, having been arrested while away from the house but on his way back); United States v. Palumbo, 735 F.2d 1095 (8th Cir. 1984) (same, concluding that when one individual failed to return to a hotel room as expected, the undercover operation would be revealed, thus supporting the exigency of the circumstances).

Based upon a review and compilation of the precedent on which the government relies, the crux of its argument on appeal is that because the two men who were arrested at the bus terminal were allegedly accompanying a third man who was with another two in the hotel room, the three men in room 220 would become suspicious somehow, prompting them to imminently destroy the evidence in their possession. Indeed, the government argued to the district court that the "hallmark" of this case is the separation of the men arrested at the bus stop and the man alleged

-13-

to be traveling with them. The government states that "[t]he fact co-conspirators had been previously arrested justified the exigency." Yet, the facts of the instant case do not comport with the precedent upon which the government relies. This record is devoid of evidence that these five men were scheduled to rendezvous at some point–i.e., that these three men were "waiting" for the other two. Nor was there any other evidence that would lead a reasonable officer to conclude that the absence of, or detainment of, the two men arrested at the bus stop would somehow alert or "tip off" these three men that something was afoot, or that law enforcement was close.

The evidence supports the proposition that the officers tracked these men because the officers believed the men were part of the conspiracy at the bus station and possessed additional contraband. But following leads in a narcotics investigation is not enough. The facts relied upon by the district court–the suspects alleged "elusion," the suspects' ticket information, and Cruz's attempt to close the door–do not establish exigent circumstances. Of course, officers need not always get a warrant even if they have probable cause to do so. King, 131 S. Ct. at 1860-61. But, to effect a warrantless entry in violation of a person's rights under the Fourth Amendment, a reasonable exception must apply. Id. at 1856. Here, viewed objectively, the government fails to establish that it was reasonable for the officers to conclude that destruction of evidence was imminent, thereby establishing exigent circumstances warranting the forced entry into room 220.[7]

Because we find no exigent circumstances here, we need not determine whether the officers in this case "created" any exigency, which itself would have necessarily precluded the warrantless entry. Id. at 1862.

---

[7]Assuming the government intended to also advance the suspects' imminent escape as a justification for the warrantless entry into room 220, which is not readily apparent from the government's brief or oral argument, any evidence in support of that assertion is scant and our analysis regarding the destruction of evidence equally applies to dispose of that claim.

The evidence used to convict Ramirez was gained after the illegal entry into room 220. The district court erred in not suppressing this evidence. Accordingly, we reverse Ramirez's conviction on count two because the evidence used to convict him was the fruit of a warrantless entry without exigent circumstances.

## III.   CONCLUSION

We reverse and remand for further proceedings consistent with this opinion.

RILEY, Chief Judge, dissenting.

I respectfully dissent because a reasonable police officer would believe exigent circumstances justified entering the hotel room to prevent the destruction of evidence.

The exigent circumstances exception allows police officers to enter a residence without a warrant in limited circumstances, including to prevent the destruction or removal of evidence, so long as the police have probable cause to search. See United States v. Cisneros-Gutierrez, 598 F.3d 997, 1004 (8th Cir. 2010). "To evaluate 'whether a warrantless entry was justified by exigent circumstances, we consider the circumstances that confronted police at the time of the entry.'" Id. (quoting United States v. Leveringston, 397 F.3d 1112, 1116 (8th Cir. 2005)). "We look objectively at whether a reasonable, experienced police officer would believe evidence was in danger of removal or destruction." Id. While such a danger of removal or destruction must be likely to occur in order to justify the entry, the police "need not . . . wait until the evidence is in the process of being destroyed before entering." United States v. Clement, 854 F.2d 1116, 1119 (8th Cir. 1988).

Objectively viewing the totality of the circumstances in this case, a reasonable, experienced police officer would believe the defendants were likely to destroy the heroin when Cruz attempted to shut the hotel room door after the officers knocked

and identified themselves. Consider what the officers knew at that moment: (1) two men were arrested that morning at the bus station with two kilograms of heroin hidden in their shoes; (2) one arrestee disclosed that a fellow passenger (later identified as Ramirez) also had heroin in his shoes, and that arrestee gave the police a description of the other passenger; (3) three men, including Ramirez, having purchased one-way, cross-country bus tickets, abandoned their California to New Jersey bus trip and left the bus station at approximately the same time as the arrest; (4) at least one of the three men, Cruz, also abandoned his suitcase on the bus; (5) the three men took a cab to a Best Western hotel, another cab to a Comfort Inn, walked to a McDonald's restaurant, and finally took a different cab to an Econo Lodge, where they checked in approximately thirty minutes before the police arrived; and (6) in a surveillance video at the Comfort Inn, two of the men appeared to still have the heroin in their shoes because they walked heavy-footed or abnormally from the Comfort Inn to the McDonald's restaurant.

In light of this evidence, the officers' belief that the men might try to destroy or hide the heroin or other evidence upon reaching the privacy of a hotel room was objectively justified. Faced with this belief, the officers had to choose between waiting two to four hours for a search warrant or trying to establish contact with the three men through some other means.[8] It is unnecessary to decide whether this evidence was enough to justify a warrantless keycard entry, as the government argues, because the police officers did not succeed in their attempted entry with the keycard.

---

[8]The officers were in no position to obtain a search warrant until the officers located where the defendants were staying. See United States v. Curry, 911 F.2d 72, 76-77 (8th Cir. 1990) ("'A search warrant must contain a description of the place to be searched' in order to comply with the fourth amendment's particularity requirement." (quoting United States v. Alberts, 721 F.2d 636, 639 (8th Cir. 1983)). The two to four hours necessary to obtain a search warrant for the defendants' hotel room could not begin to run until the defendants were discovered and identified at the Econo Lodge.

-16-

Instead, the officers thereafter tried to establish contact with the defendants by knocking on the door and announcing their presence when Cruz opened the door, which the officers certainly could do with or without exigent circumstances. Cruz's response of opening the hotel room door, seeing the police and then pushing the door shut (1) objectively supported the officers' reasonable belief the defendants' next step would be to destroy or dispose of the heroin, and (2) made immediate action necessary to prevent the destruction of evidence.

The panel majority determines there were no exigent circumstances, see ante at 14, arriving at this conclusion by minimizing the significance of the defendants' conduct before checking into their room. For example, the panel majority dismisses as a mere assumption Investigator Alan Eberle's belief the three men left the bus station because they observed the arrests of their co-conspirators, concluding "there is insufficient objective evidence to support his presumption." Id. at 6-7 & n.1. I disagree. Why would three men traveling from California to New Jersey with paid bus tickets—one reportedly carrying heroin is his oversized shoes—abruptly abandon before dawn their chosen cross-country mode of transportation, and also some of their luggage at the Omaha bus station, and use three cabs to visit three hotels located in different areas of the city? Considering the co-conspirators' arrests occurred at the bus station, close in time to when the defendants disappeared, it was reasonable, and not speculative, for the police officers to deduce the three men observed their co-conspirators' encounter with police and decided to flee the scene.

I also disagree with the panel majority's assertion "[t]here is no evidence supporting the inference that these men knew the police were tracking them at all." Id. at 11. Even if one ignores the logical conclusion the men fled the station to avoid the fate of their confederates, the defendants obviously knew the police officers successfully tracked them by the time Cruz opened the hotel door. Even before this point, the defendants' clandestine efforts indicate they were trying to evade law enforcement. Three hotel visits by three different cabs before dawn is suspicious

-17-

behavior for even the most discerning traveler. This conduct supports at least a reasonable suspicion the defendants feared the police would try to find them.

Having removed these circumstances from consideration, the panel majority reasons Cruz's act of closing the door—described by Investigator Stephen Rasgorshek as an "attempt[] to slam the door shut"—"does not support the exigency here," id. at 10. While the panel majority is correct, "Cruz was under no obligation to allow the officers to enter the premises . . . and was . . . within his bounds in his attempt to close the door," id., the propriety of Cruz's act is not dispositive of the issue at hand.

Cruz's act of shutting the door did not occur in isolation, but was the culmination of a more than a two-hour "goose chase," id. at 2, during which the police obtained information leading them to believe there was a risk the defendants would rid themselves of the heroin. Viewed in context, Cruz's act of closing the door on the police transformed this risk into a near certainty. By itself, closing a door on police officers would not provide a reasonable belief exigent circumstances exist. But it is entirely proper for the officers to consider the door closing within the totality of the circumstances. See, e.g., United States v. de Soto, 885 F.2d 354, 368 (7th Cir. 1989) (finding exigent circumstances and holding the threat of destruction of evidence justified a warrantless entry of an apartment when the occupant responded to a police officer knock and identification by "attempt[ing] to slam the door in [the police officer's] face"); cf. Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983) ("In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."). When added to the existing suspicious circumstances, Cruz's closing the door additionally justifies the officers' entry.

Because exigent circumstances existed when Cruz shut the hotel door, the question becomes whether the police officers impermissibly created these exigent

circumstances, in which case they cannot justify the warrantless search. See United States v. Duchi, 906 F.2d 1278, 1284 (8th Cir. 1990). The Supreme Court has instructed "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable" within the meaning of the Fourth Amendment. Kentucky v. King, 563 U.S. ___, ___, 131 S. Ct. 1849, 1858 (2011). "Where . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." Id.

Here the police officers did not violate, nor threaten to violate, the Fourth Amendment before knocking on the door. The police officers' attempt to enter the room with a keycard obtained from the desk clerk was, at worst, an attempted Fourth Amendment violation. The officers' failed entry attempt is immaterial because it did not create the exigency. The record indicates the officers did not hear any movement inside the hotel room after the officers' failed keycard entry attempt. And the fact Cruz answered the door shows the botched keycard entry had no effect on events inside the room.

In light of King, the police officers' subjective intent has no bearing upon our decision. See id. at ___, 131 S. Ct. at 1859 (rejecting a test that asked whether police officers created exigent circumstances in a bad faith attempt to avoid having to get a warrant because the subjective nature of such a test is inconsistent with typical Fourth Amendment jurisprudence). Because the officers did not create the exigency by committing or threatening to commit a Fourth Amendment violation, the exigent-circumstances exception should apply in this case.

A highly experienced magistrate judge and district judge, as well as this circuit judge, did not perceive a constitutional violation here. I wonder how police officers on the firing line can distinguish the fine legal lines we draw here today. I would

-19-

affirm the district court's denial of Ramirez's motion to suppress the heroin found in the hotel room.

_____